[No. 25422.    Department Two.    August 13, 1935.]

MICHAEL BAROVIC, *Respondent*, v. MARY CONSTANTI, *as Administratrix, Appellant.*[1]

[1]Reported in 48 P. (2d) 257.

*Q. A. Kaune, Chas. L. Westcott,* and *Hayden, Metzger & Blair,* for appellant.

*Bogle, Bogle & Gates, Ray Dumett,* and *Frank D. Davis,* for respondent.

*Harry H. Johnston,* for referee.

BLAKE, J.—For a number of years prior to his death in the summer of 1932, Dominic Constanti owned and operated a number of moving picture theaters in Tacoma, Puyallup and Sumner. The plaintiff, his son-in-law, was manager of the theaters in Puyallup and Sumner.

In the late fall of 1929, Barovic was approached by one McNerney with a proposition to build a theater at Aberdeen. McNerney at that time was sales manager for United Artists Corporation at Seattle. He had known both Constanti and Barovic for a number of years. His idea, as first presented to Barovic, was to establish theaters, not only at Aberdeen, but at Yakima, Wenatchee and Port Angeles. Aberdeen, however, according to McNerney, afforded the best immediate opening, due to the fact that the Fox people were without competition in that field. His idea was to procure franchises from Warner Bros. for the exclusive exhibition of pictures produced by them.

Neither McNerney nor Barovic had any considerable financial resources. So, at the suggestion of McNerney, the proposition was presented to Constanti. At first, it was the intention of the parties to go into the enterprise on a one-third basis—each to put in six thousand dollars. Shortly after this, McNerney was transferred to San Francisco and dropped out of the enterprise.

In the meantime, Barovic entered into contracts with Vitagraph, Inc., and First National Pictures, Inc. (subsidiaries of Warner Bros.) for franchises at

Aberdeen. These contracts were entered into on November 8 and December 12, 1929, respectively.

A site for the theater was procured, and title was taken in the name of Constanti. Construction of the theater was commenced in the early part of January, 1930. The theater was completed at a total cost of upwards of $150,000. It was operated for six or seven weeks by Constanti and Barovic, and then sold to Warner Bros. Downtown Theatre Corporation for $215,000. The sale was consummated by the deposit of the purchase price with a Tacoma bank, as trustee. The bank, after paying outstanding obligations, turned the balance over to Constanti. The latter never accounted to Barovic for the purchase price nor for the profits of operation of the theater before sale.

Constanti died in August, 1932. Barovic presented to the administratrix of Constanti's estate a claim for $17,333.33, estimated to be one-third of the profits made in the operation and sale of the theater. The claim having been rejected, Barovic brought this action against the administratrix for an accounting and for the amount of the claim. The theory of the complaint was that Constanti and Barovic were engaged in a partnership or joint venture in the erection and operation of the theater. By answer, the defendant joined issue and set up three counterclaims, which, for the present, need not be noticed.

The court, after an extensive hearing, found that the building and operation of the theater at Aberdeen was a partnership venture, in which Constanti had two-thirds interest and Barovic one-third. An interlocutory order was entered referring the matter to a referee for an accounting. The referee found the profits from the sale and operation of the theater to be $70,520.10. He found that defendant was entitled to offsets aggregating $2,091.84. Deducting this amount

from $23,506.70 (one-third of the profits), plaintiff had coming $21,414.86, for which amount the court entered judgment in his favor. Defendant appeals.

Appellant makes fourteen assignments of error, which are discussed under four headings: (1) That the evidence does not sustain the finding of partnership or joint enterprise; (2) that respondent's recovery must be limited to the amount of his claim, i. e., $17,333.33; (3) that the scope of the accounting before the referee was erroneously limited; (4) that the court erred in allowing the referee a fee of five hundred dollars.

In a controversy such as this, little help can be gotten from decided cases. Of necessity, each case must be determined on its own facts. And, for the most part, the facts are to be gleaned rather from the acts and conduct of the parties than from the spoken word. The difficulty in attempting to solve the problem from what the parties said is made manifest by this record. A number of witnesses testified that Constanti on various occasions told them that Barovic had an interest in the enterprise; that it was Barovic's deal; that he was backing Barovic, etc. On the other hand, other witnesses, apparently of equal credibility, testified that Barovic had made statements to the effect that he was simply working for Constanti, and that he had no interest in the enterprise. So, we shall not undertake to weigh the testimony of one witness against that of another, but shall confine ourselves to a consideration of facts which are not controverted, or which, in our opinion, are established by clear and convincing evidence. We shall first consider the facts which tend to support respondent's contention, and then state those which tend to support appellant's.

To begin with, the enterprise was conceived by McNerney. He proposed to Barovic a partnership or

joint venture and suggested that franchises from Vitagraph and First National be obtained. These franchises were obtained by Barovic before a site for the theater had been procured. Whether they were obtained before Constanti was approached, is not clear. In any event, when Constanti was approached, the proposition was presented to him as a joint venture or partnership enterprise—each of the partners to have a one-third interest. Negotiations, in which Barovic had an active part, were entered into for lease of a theater site. These negotiations were broken off when the owner made some condition or demand with which Constanti declined to comply. A lot was then purchased. Plans for the theater were immediately prepared, and construction commenced in the first part of January. It was necessary, under the Vitagraph and First National franchises, that the theater should be ready for occupancy on April first. To accomplish this, the work was carried on twenty-four hours a day.

December 26, 1929, Constanti left for California and was gone for three or four weeks. During the period of construction, Barovic was on the job much of the time. He conducted all the preliminary negotiations for furnishings and lighting and electrical equipment. He not only negotiated but executed in his own name the following contracts: One with Electrical Research Products, Inc., for sound equipment; one with General Illuminating Company for the installation and lease of a Neon sign; one with Aberdeen Electric Shop for the installation of heating equipment. While he did not execute, as vendee, the conditional bill of sale for furnishings, he did sign in his own name the preliminary order for opera chairs. All proposals for furnishings were made to him, and orders therefor were made by him.

Prior to the completion of the theater, the Fox peo-

ple initiated negotiations looking toward buying it. They made an offer which would have netted a profit on the enterprise of twenty-five thousand dollars. Of this offer and its rejection, the Fox representative testified:

"Mr. Constanti said that whatever Barovic wanted to do that would be all right with him because he started that thing for the boy, and went on to say what he had done in the line of working with him and that it was Mike's (Barovic's) and left it entirely to Mike. At the time Mike said he would not sell for less than fifty thousand dollars, that is he would not sell for a profit of less than fifty thousand dollars."

Under the franchise agreements, Vitagraph and First National reserved a fourteen day option to meet any offer that might be made for the purchase of the theater. Upon being notified of the negotiations with Fox, representatives of Warner Bros. came on the scene. After some negotiations, the deal with Warner Bros. Downtown Theatre Corporation was consummated. We think there can be no doubt but that Barovic was an active participant in the negotiations with both the Fox and Warner Bros. representatives. In closing the deal with the Warner people, Barovic executed assignments of the Vitagraph and First National franchises, and also assignments of such of the contracts as he had entered into personally. November 26, 1929, Barovic borrowed three thousand dollars on his home. This money went into one of Constanti's checking accounts. Again, early in March, when money was badly needed, Barovic borrowed one thousand dollars, which also went into one of Constanti's checking accounts.

Now, the salient facts from appellant's viewpoint may be summed up as follows: First, it is to be noted that appellant's explanation of the three thousand and

one thousand dollar contributions just mentioned were loans to Constanti, the proceeds of which the latter used for purposes other than the Aberdeen enterprise. While there is some foundation for this claim, we are convinced that these contributions were made by Barovic in furtherance of the theater project. (Barovic claimed that he contributed an additional eight hundred dollars in cash. This we have not considered, because we do not find any corroborative proof of the assertion.)

As has been indicated, Constanti was a man of considerable financial responsibility; Barovic of little. The financing of the enterprise was made possible by Constanti's financial standing. For the lot was purchased, and the theater built and furnished, very largely on credit. The site was purchased for twenty thousand dollars cash. A mortgage of sixty thousand dollars was immediately placed upon it, the proceeds of which were used in the construction of the theater. Early in March, in order to get funds to complete the theater, this mortgage loan was increased to ninety-five thousand dollars. The furnishings and equipment were acquired on lease or by conditional bill of sale, with relatively small cash payments. For instance, the contract for furnishings totaled $16,720.34, of which $4,878 was payable on delivery, the balance being payable in twelve monthly installments beginning May first. Likewise, the contract for opera chairs, for a total of $10,711.74, was payable forty per cent on delivery and balance in fifteen monthly installments. It thus appears that the project was, in an extraordinary degree, made to finance itself. As we have said, this method of financing was largely made possible by Constanti's financial responsibility.

But there was another factor, without which it would have been impossible to so finance the project, namely,

the franchise contracts which Barovic had with Vitagraph and First National. Without them, a theater at Aberdeen would have been a liability rather than an asset. Without them, it is reasonably certain that the construction of the theater could not have been financed at all. Without them, it is certain that neither Constanti nor Barovic would have undertaken the project.

While we have been unable to determine the amount of the contributions made by Constanti from his personal resources, they were substantial, and considerably more than those made by Barovic.

As the theater neared completion, an intensive advertising campaign was put on for the "Grand Opening." In all the advertising, Constanti was referred to as the builder and owner of the theater, and Barovic was referred to as the manager.

As we have already pointed out, Constanti took title to the site in his own name. He executed, as vendee, the conditional bills of sale for the furnishings and the opera chairs. He, of course, participated in all negotiations for the sale to Warner Bros. Downtown Theatre Corporation and signed, as vendor and assignor, all papers in connection with the transfer. He received the proceeds from the sale and, so far as the record shows, used them as his own. He reported the profits as his own in his income tax return for 1930. June 5, 1930, he gave Barovic a check for $3,126.65, which was the amount of principal and interest then due on the mortgage loan Barovic had placed on his house. He also reimbursed Barovic, without interest, for the one thousand dollars the latter gave him in March.

Aside from the testimony relative to admissions against interest made by both Constanti and Barovic, the foregoing constitute the salient facts upon which

we are called upon to determine whether the trial court was warranted in finding that a partnership or joint venture existed. As to the testimony of witnesses relative to admissions against interest by both the parties, we must necessarily accept the appraisement of their credibility made by the trial court. For, so far as disclosed by this record, the truth or falsity of their testimony could be determined only from observation of them while they were on the witness stand. But, in addition to whatever weight the trial court attached to testimony of admissions made by Constanti, we think it was fully warranted in its finding of partnership or joint venture, by the facts which we have narrated.

The project was conceived by McNerney, who first approached Barovic. There can be no question but that, when Constanti was first approached, the idea was to take him in to the deal for a one-third interest. Barovic obtained and owned the franchises for Vitagraph and First National. These were quite as important a factor in financing the project as was Constanti's splendid financial standing. It was the combination that made the financing possible. Constanti may have put more than twice as much of his personal resources into the enterprise as did Barovic. On the other hand, Barovic put infinitely more time and personal effort into it than did Constanti.

█ There is one factor upon which appellant lays much stress—the delay of Barovic in demanding an accounting until after Constanti's death. The appellant cites a number of cases in which this seems to have been the deciding factor. *McDonald v. Edgcomb*, 68 Wash. 393, 123 Pac. 525; *Kelly v. Moss*, 120 Wash. 1, 206 Pac. 941; *Doneen v. Doneen*, 134 Wash. 271, 235 Pac. 797; *State ex rel. Melbye v. Superior Court*, 148 Wash. 616, 269 Pac. 791. But mere delay in asserting claim, or failure to assert a claim until after the death

of the alleged partner or co-adventurer, is not of itself controlling. The fact must be considered along with all other facts and circumstances surrounding the transaction. Considering that fact and giving it due weight in connection with all the other facts and circumstances, as above narrated, we think the court was fully warranted in finding that Constanti and Barovic were partners or co-adventurers in the erection of the theater. See *Nicholson v. Kilbury,* 83 Wash. 196, 145 Pac. 189. This conclusion is reenforced by the weight we must necessarily attach to the trial court's appraisement of the credibility of witnesses who testified to admissions against interest made by both Constanti and Barovic. *In re Krilich's Estate,* 122 Wash. 306, 210 Pac. 788, 215 Pac. 9.

■ The contention that respondent's recovery must be limited to the amount stated in the claim, to-wit: $17,333.33, is untenable. From a reading of the entire claim, it is apparent that respondent was asserting a right to an accounting of the profits resulting from the operation of the theater and ownership of one-third of such profits. He stated in the claim that he was unable to make an accurate statement of the profits, because the books and records which would disclose the amount were in the hands of appellant, but that he estimated the total profits to be not less than $52,000. He demanded that the administratrix render an accounting *"to the end that this claimant's share of the profits be determined."*

No authority has been furnished in support of the contention that recovery is limited by the statement of an amount estimated to be due. The statement of the amount estimated to be due was not misleading in any respect. It is clear that the claim was for an unliquidated, and not a specific, sum. It was received by the administratrix in due course of administration and

rejected *in toto*. It was sufficient to sustain recovery of an amount to be found due after an accounting by the administratrix. See *Brownfield v. Holland,* 63 Wash. 86, 114 Pac. 890; *Andrews v. Kelleher,* 124 Wash. 517, 214 Pac. 1056. Speaking of a contingent claim in the latter case, the court used language which is applicable here:

"We think that, viewed as such a claim, which it manifestly was at the time of its presentation, it did not fail of proper verification because of a want of a statement in the verification that 'the amount is justly due,' and that the verification as made was sufficient as long as it complied with § 1473, Rem. Code, in so far as it was truthfully possible to comply with that section."

The contention that the referee refused to admit evidence to the effect that Constanti, with Barovic's consent, had invested the profits of the venture in another enterprise, is without merit. The issue was not raised by the pleadings nor at any time during the trial. The proof tendered could not have been received by the referee, under the authority vested in him by the interlocutory order. In substance, that order declared the estate to be indebted to respondent in the amount of one-third of the net profits of the enterprise. The order granted the parties a reasonable time in which to agree upon the amount of the profits. The parties failing to agree, the order provided for a reference. The powers granted to the referee were specifically for an accounting and ascertainment of the amount due respondent. Nowhere in the order is it suggested that the referee had any power other than to strike a balance on the account.

The court made an allowance of five hundred dollars to the referee. Appellant contends that this, or any amount in excess of three hundred and fifty dollars, is unreasonable. We think the amount allowed

is reasonable. The court, however, is not vested with any discretion in the matter of fixing the fees of referees. Their compensation is fixed by statute. Rem. Rev. Stat., § 483 [P. C. § 7464]. It is conceded that five hundred dollars is in excess of what the referee would be entitled to under the statute. Likewise, we infer that three hundred and fifty dollars is more than the statutory fee would be. Since appellant has impliedly, at least, agreed to a fee of three hundred and fifty dollars, we shall not undertake to ascertain what the referee would be entitled to under the statute. The court will reduce the referee's fee to three hundred and fifty dollars.

In all other respects, the judgment is affirmed.

STEINERT, MITCHELL, and HOLCOMB, JJ., concur.

