[No. 32912. Department One. January 6, 1955.]

BERT EDER, *Respondent and Cross-appellant,* v. ELMER C. REDDICK *et al., Appellants.*[1]

¹Reported in 278 P. (2d) 361.

*Cunningham, Reis & Kenison,* for appellants.

*Campbell & Klasen,* for respondent and cross-appellant.

HAMLEY, J.—Bert G. Eder brought this action to establish the existence of a partnership agreement with Elmer C. Reddick to construct and sell a motel. An accounting, sale of the motel, and a division of the profits were also sought. Reddick and his wife were named defendants. Their answer was a general denial, it being alleged that plaintiff was not a partner in the undertaking, but was employed and compensated as a carpenter in constructing the motel.

The action was tried on January 13 and 14, 1953. Immediately after the close of the case, the court rendered its oral decision in favor of defendants. Plaintiff moved for judgment notwithstanding the oral decision, or for a new trial. Following argument on this motion, the court, on February 2, 1953, filed its memorandum opinion reversing the position originally taken by the court. Defendants then interposed a like motion, which was denied.

On April 6, 1953, the court entered findings of fact and conclusions of law to the effect that the parties had entered into such a partnership agreement; that the agreement required Reddick to provide the financing and to purchase the materials for the construction of the motel, while Eder was to draw the blueprints and furnish his services; that, under this agreement, plaintiff was to receive one third of the profits or be liable for one third of the losses in connection with the construction and sale of the motel; that the partnership came into existence in April, 1952, and was dissolved on August 8th of that year; that the motel had been constructed but had not been sold as agreed upon; and that it was being operated by defendants.

On the same day, April 6, 1953, the court entered an interlocutory order requiring defendants to account to plaintiff concerning the cost of constructing the motel, and the profits or losses resulting from its operation. This order

further provided that, unless the parties could agree upon the market value and sale of the motel, a receiver would be appointed, the property sold, and the profits revealed by the accounting divided in accordance with the partnership agreement.

On September 21, 1953, defendants filed their accounting. Hearings on this and supplemental accountings were held on October 14 and 23, 1953, and January 29, 1954. On March 15, 1954, the court entered an order settling the accounts and winding up the affairs of the asserted partnership.

Defendants appeal from both orders. With regard to the interlocutory order, the assignments of error are directed primarily to the finding of fact that Eder and Reddick had entered into a partnership agreement of the kind described above.

The evidence is uncontradicted that, for a period of twenty months extending from 1950 to 1952, Eder was employed by Reddick in connection with the construction of several houses and duplexes in Portland, Oregon. Eder, who did not belong to a union, performed carpenter, finishing, and layout work. He also prepared blueprints for at least two of Reddick's houses. Eder testified that he was employed as a foreman on this work, but this was denied by Reddick. Eder usually worked six days a week, for which he received a weekly wage of one hundred fourteen dollars. This work was terminated in February, 1952.

Eder gave this version as to what then transpired: After Eder's employment for Reddick in Portland came to an end, the two discussed the construction prospects in the Columbia Basin area. These discussions took place in Portland and during several trips the two made to that area. Eder told Reddick that he could not work for wages, and the only way he could "go in" with Reddick would be as a partner. On one of the trips to the Columbia Basin area, about April 1, 1953, he and Reddick and one George Livingstone, who was with them at the time, discussed a possible three-way partnership to build houses. However, nothing came of this suggestion. On another trip later the same month, Eder and Reddick decided to build and sell a motel

at Moses Lake under a partnership agreement. Eder could not remember the exact date when they entered into this agreement.

Eder further testified: The two orally agreed that Reddick would put up the capital, handle the financing, and provide materials. Eder would furnish the "know-how," prepare the blueprints, place orders for materials, and supervise construction. The motel would be sold for about sixty-five thousand dollars. Reddick offered to split the profits evenly, but Eder said that his own share should be one third. Each was to draw one hundred dollars a week for subsistence from a "building" fund.

Reddick gave this version: When, in March, 1952, a poor market for the sale of homes developed in Portland, Reddick decided to investigate housebuilding prospects in the Moses Lake area. He made one trip to the area with George Livingstone, and later offered to pay Eder's expenses on a second trip. Eder accepted. The purpose of this trip was to purchase some building lots and a house for Reddick to live in. Before starting this trip, Eder remarked that, if he sold his Portland house and moved to Moses Lake, he would have about four thousand dollars. He asked Reddick if the two could then "go in together," with Reddick to handle the financing and Eder to get one third of the profits. Reddick indicated that he would try to work out such an agreement. This discussion was with reference to the building of houses, no mention being made of a motel.

Reddick further testified: On a later trip, the two lots upon which the motel was thereafter constructed were purchased. On a third trip to Moses Lake, Reddick and Eder surveyed the lots which had been purchased, and dug forms. This trip required three and a half days, and Reddick paid Eder seventy dollars for his time. On their return to Portland, Eder asked Reddick if he could work for Reddick on the motel until he sold his house. Reddick assented, and the wage agreed upon was one hundred dollars for a forty-hour week.

Continuing his testimony, Reddick stated that, after work on the motel had been in progress for about six weeks, Eder

told Reddick that Eder's wife would not move to Moses Lake, and he could not sell his Portland house. Eder then asked if Reddick would let him supervise the construction of the motel on a partnership basis "and run it like we were talking of once about building houses." Reddick declined, but agreed to let Eder continue working on the motel at the rate of one hundred dollars a week. Reddick testified that this conservation took place in the presence of Mrs. Reddick, whose testimony corroborated her husband's version.

It is obvious that these two versions of the business transaction between Eder and Reddick concerning the motel are in sharp conflict. The trial court apparently found no reason for outright acceptance or rejection of either version. The court therefore evaluated these conflicting versions in the light of the surrounding circumstances. Regarding some of these circumstances, the evidence is not in dispute, but on some points the evidence is again conflicting.

The evidence is undisputed that Reddick supplied all of the funds and credit which were required to construct the motel. The real property and all materials which went into the motel were purchased by Reddick, in his name. Reddick made application for the building permit, paid for it himself, and it was issued in his name.

Eder testified that he did not receive wages while working on the motel, but that the one hundred dollars a week which was paid to him was for "subsistence," and was drawn from the partnership "building" fund. Eder drew a total of $1,470. He stated that Reddick also drew one hundred dollars a week from the fund, at least until Reddick's family moved to Moses Lake. Eder testified that the "building" fund consisted of money which Reddick deposited in a Moses Lake bank. It is not disputed that Reddick and his wife were the only persons authorized to draw on this bank account, which was maintained in their names.

Reddick denied that he drew one hundred dollars a week from this account for his own use. He testified that the sums paid Eder represented carpenter's wages and not subsistence. The hourly rate for union carpenters on the job

was $2.51, which would be $100.40 for a forty-hour week. Reddick testified that, since Eder was not a union man, the one hundred dollars paid to him at Moses Lake represented "a little extra" for being a "layout" man. It is not contradicted that Eder prepared the blueprints for the motel.

Concerning the matter of control over the work, Eder testified that it was assumed that he and Reddick had equal rights. Eder testified that he made all of the estimates as to costs, determined what was needed, and drew the blueprints. Eder stated that Reddick consulted with him on practically every expenditure. Eder referred a building material salesman to Reddick, but hired Livingstone to do the plumbing work.

Reddick testified, on the other hand, that he did all of the hiring and firing on the job. He did, however, ratify Eder's act in employing two workmen and in engaging Livingstone to do the plumbing. Reddick stated that he directed Eder in his work on the job. Reddick negotiated the only two subcontracts on the motel, and the subcontractors looked to Reddick alone for payment. A carpenter on the job testified that, when Reddick was there, Reddick was the foreman, and Eder worked the same as the other employees. When Reddick was absent, Eder ran the job.

An apprentice carpenter testified that when he applied for a job, Eder told him that "the boss" was in Portland. This witness testified that Eder employed him, after some hesitation, and only after the witness agreed that he might be fired when the "boss" returned, if the latter did not want him. This witness testified that the other workmen regarded Eder as the foreman and Reddick as the "boss."

Regarding the time which Eder devoted to the work on the motel, it is undisputed that Eder never worked on Saturdays or Sundays. He always went to Portland on Friday afternoon and returned to Moses Lake on Monday morning. He usually left in the early afternoon on Friday. Eder testified that on some weeks he worked more than forty hours and some weeks less. Hours did not mean anything to "us," Eder testified. He conceded that he may have jokingly

told other employees that he had his forty hours "in," and was going back to Portland.

Reddick testified that Eder's hours were from seven to eleven in the morning, and from twelve to four in the afternoon, five days a week. He stated that there were many weeks when Eder did not work forty hours, and none when he worked more than forty hours. Two employees on the job testified that Eder usually started working the same time as the other workmen, but sometimes began working ahead of the others. These employees both heard Eder make the statement on some Fridays, "Well, boys, I've got my forty hours in. I'm heading for Portland."

It is undisputed that Eder's Federal incomes taxes were not withheld, either in Portland or in Moses Lake. Reddick did not withhold the taxes of any of his employees in Portland, but, in Moses Lake, taxes were withheld and records kept on everyone except Eder. Reddick testified that he did not "take any social security out" for Eder. His explanation for this omission was that it was originally intended that Eder would work for Reddick only a week or two, until he sold his house in Portland. The accountant who handled matters in connection with this project testified that all accounts, including social security, were in Reddick's name.

There is testimony by Eder and others, disputed by Reddick, to the effect that, in connection with a number of transactions, Reddick held out Eder to others as a partner in the motel project. A business agent for the painters' union testified that Reddick introduced Eder as his "building partner." Another union official who was present at the time could not remember the words used in introducing Eder.

A member of the planning commission testified that, at a meeting of that agency, he introduced Reddick and Eder as partners, this being done on the basis of a previous statement made to him by Reddick. Another member of the commission and Eder testified that Reddick and Eder were introduced as partners at this meeting. Reddick denied having told anyone that Eder was a partner in the building of the motel. Reddick further testified that he had introduced

Eder as a person who was "going to be a partner" in the construction of houses.

A handwritten letter, dated May 13, 1952, addressed to the mayor and city council, was signed by both Reddick and Eder. Eder testified that he wrote the letter and signed it; that Reddick then signed it over Eder's signature; and that Reddick subsequently handed the letter to the mayor. Reddick identified his signature, but had no other recollection about the letter.

It is admitted that all employees, except Eder, were included in a report submitted to the department of labor and industries. It is also undisputed that the application and report to this agency were in the names of both Reddick and Eder. There is no direct testimony that the application, prepared by an accounting firm, was filled out and included that designation at the time Reddick signed it. Reddick testified that he signed blank forms. It is undisputed that Reddick, upon discovering that the account was being carried under both names, instructed the accounting firm to correct the designation to show only Reddick's name.

A Portland retail lumber and appliance businessman testified as follows: He sold some building material to be used on the motel. Reddick ordered the lumber, and the account was carried in his name. The witness delivered the materials personally. In Eder's presence, Reddick stated that it was his motel, and that he (Reddick) was going to either sell it or let his wife run it. Eder voiced no objection to this statement.

Eder testified that he did not hear this conversation.

While it has not been possible to refer to all of the testimony, we believe that the above summary presents a fair review of the material evidence. Before indicating our evaluation of it, a statement of the applicable legal principles is in order.

■■ The trial court's finding of fact that Eder and Reddick had entered into a partnership agreement is not to be set aside unless we find that it is contrary to the preponderance of the evidence. *Minder v. Gurley,* 37 Wn. (2d) 123, 222 P. (2d) 185. In judging whether the evidence

preponderates against this finding, it must be borne in mind that the burden of proving a partnership rests upon him who alleges it. An equally applicable principle is that, in proving a partnership, the evidence must be stronger as between the parties themselves than when third persons assert its existence. *Cruickshank v. Lich,* 158 Wash. 523, 291 Pac. 485; *Bengston v. Shain,* 42 Wn. (2d) 404, 255 P. (2d) 892.

By statute, a partnership is defined as an association of two or more persons to carry on as co-owners a business for profit. RCW 25.04.060 [*cf.* Rem. Supp. 1945, § 9975-45]. A partner is co-owner with his partners of specific partnership property, holding as a tenant in partnership. RCW 25.04.250 [*cf.* Rem. Supp. 1945, § 9975-64]. The statutes set out several rules for determining the existence of a partnership, but they relate to facts and circumstances not relevant to this case. See RCW 25.04.070 [*cf.* Rem. Supp. 1945, § 9975-46].

A contract of partnership, either express or implied, is essential to the creation of the partnership relationship. *Nicholson v. Kilbury,* 83 Wash. 196, 145 Pac. 189. Such a contract must contemplate a common venture uniting labor, skill, or property of the parties, for the purpose of engaging in lawful commerce or business for the benefit of all of them; a sharing of profits and losses; and joint right of control of its affairs. *Nicholson v. Kilbury, supra; Constanti v. Barovic,* 199 Wash. 117, 90 P. (2d) 724; *Bengston v. Shain, supra.*

Whether a partnership contract has come into existence depends, as in the case of other contracts, on the intention of the parties, this intention to be manifested by the conduct, statements, and writings of the parties. It is not necessary that the existence of such a contract be established by direct evidence, but it may be implied from the circumstances. As in other cases, however, circumstantial evidence does not tend to prove the existence of a partnership, unless it is inconsistent with any other theory. For the most part, the facts are to be gleaned from the acts and conduct of the parties, rather than from the spoken word.

No one fact or circumstance will be taken as the conclusive test. *Nicholson v. Kilbury, supra*; *Barovic v. Constanti,* 183 Wash. 60, 48 P. (2d) 257; *Constanti v. Barovic, supra*; *Minder v. Gurley, supra*; *Bengston v. Shain, supra.*

■ Applying these principles to the testimony submitted in this case, as summarized above, we are convinced that Eder did not sustain his burden of proof, and that the evidence clearly preponderates against the finding of the trial court that Reddick and Eder had entered into a partnership agreement.

Reddick supplied all of the money and credit for the undertaking, purchased the real property and all materials and supplies in his name, and paid Eder for his time at a rate substantially conforming to the prevailing scale for carpenters. No partnership fund or account was established. Eder exercised no dominion or control over the property or project, except such as would be consistent with the duties of a foreman.

Eder made no substantial contribution to the motel project for which he was not compensated. He produced no witness to any of the asserted oral negotiations between himself and Reddick. Eder's testimony as to when and where the asserted agreement was consummated was extremely vague.

There was evidence of a holding out of Eder as Reddick's partner, in connection with some of the motel transactions. This evidence is entitled to consideration, but is not conclusive. In some instances, the fact that there was a holding out is seriously disputed; in other cases, the holding out is explainable on the theory that both Reddick and Eder sought to avoid the necessity of having Eder join the union. Two disinterested witnesses testified that Eder worked on a time basis. One witness stated that Eder did not protest when, in his presence, Reddick said that he owned the motel and might have his wife operate it. Another witness stated that Eder referred to Reddick as the "boss." The evidence is undisputed that Reddick acted promptly to remove Eder's name from certain accounts and billings which originally named both parties.

Were the rights of third persons involved in this proceeding, the testimony concerning a holding out of Eder as a partner might be sufficient to establish liability against Reddick. See RCW 25.04.160 [*cf.* Rem. Supp. 1945 § 9975-55], relating to partnership by estoppel. As previously noted, however, in proving a partnership, the evidence must be stronger as between the parties themselves than when third persons assert its existence.

It is our conclusion that, for the reasons given, the trial court erred in entering the interlocutory order of April 6, 1953, decreeing the existence of a partnership and ordering an accounting. It is therefore unnecessary to consider appellants' other assignments of error, or respondent's assignment of error on his cross-appeal, involving the final order of March 15, 1954.

The order of April 6, 1953, is reversed, and the cause is remanded with direction to dismiss the action.

GRADY, C. J., MALLERY, FINLEY, and OLSON, JJ., concur.

February 18, 1955. Petition for rehearing denied.