[No. 6525–1–III. · Division Three. November 14, 1985.]

EARL H. CUSICK, ET AL, *Appellants*, v. GREG A. PHILLIPPI, ET AL, *Respondents*.

148

*Robert L. Parlette* and *Davis, Arneil, Dorsey, Kight & Parlette*, for appellants.

*James M. Danielson, Donald L. Dimmitt,* and *Jeffers, Danielson, Sonn & Aylward, P.S.,* for respondents.

THOMPSON, J.—The Cusicks[1] appeal the dismissal of their claims, arguing the trial court should have found breach of a fiduciary duty, negligence, and violations of both the Consumer Protection Act and the commission merchants act. We affirm all issues except attorney fees.

In 1977 the Cusicks were part of the Brayland group of investors, who entered into a written agreement to purchase a 280-acre apple orchard in Douglas County. That agreement, entitled "Brayland Tenancy in Common", provided for common ownership of the orchard with profits and losses apportioned according to relative percentage interests. Paragraph 12 of the tenancy agreement provided in part:

---

[1]For ease of reference, all appellants are referred to as Cusicks.

12. *Nature of Agreement*: This Agreement does not create a Partnership and except as herein provided, none of the undersigned, individually or collectively, may act in representative capacity for any other or all of the undersigned.

Phillippi Fruit Company, owned in its entirety by Greg and Dave Phillippi, was named as consulting agent and pursuant to the terms of an accompanying "Consulting Agreement" was to operate the orchard, distribute profits, and present quarterly accounting statements. For these services, Phillippi Fruit was to receive $4,200 per month. Additionally, in a pooling agreement, all the owners agreed to pool their fruit for handling, storage and sale by Phillippi Fruit and Peshastin Fruit Growers. The three agreements provided for attorney fees in the event of actions arising thereunder. Thereafter, an informal group called the Brayland Committee was established to facilitate business communications between the owners and the Phillippis.

In an April 1981 addendum to the original pooling agreement, the parties named Phillippi Fruit as exclusive manager and operator of the pooled fruit. In the addendum, Phillippi Fruit indicated to the Brayland investors it intended to make a substantial capital investment in order to automate its packing and warehouse facilities and provide continuity of fruit deliveries. This agreement was entered into specifically to help pay for the capitalization of a new presizer and automatic packer.

In October 1981, the Brayland Group met to consider a third party offer to purchase their orchard interests. The Phillippis exercised a right provided in the tenancy agreement to meet the third party offer and purchased the real property interest of those investors choosing to sell. The Phillippis thus obtained an 85 percent interest in the real property, but the investors retained interests in the 1981–82 crop of apples.

The group met again October 28 to discuss the Phillippi purchase and plans for the 1981 crop. At that meeting, one investor wanted to sell the apples early to pay off an

$800,000 crop production loan while others favored leaving the marketing decision to the "experts", *i.e.*, the Phillippis. The group requested improved communications and thereafter each member of the group received a monthly computer statement detailing shipment, sales, and general movement of the fruit. No quarterly reports were issued, however, and the computer printouts were generally 2 months behind the actual transaction. The group received a letter from Dave Phillippi stating in part:

> Anticipating a season similar to the 1977 crop we do not plan on selling fruit heavily until spring of 1982. We will watch the movement, keep close track of the storage quality, and if the indicators change, we will market accordingly.

Expert testimony established an industry "rule of thumb" recommending harvest of Red Delicious apples 145 to 155 days from bloom date. Additionally, a Washington Growers Clearing House Association bulletin dated October 1, 1981, admitted into evidence, contained the following maturity committee report:

> The Committee wishes to report that all our tests indicate that Red Delicious are advancing in maturity much faster than they did last year. *Based on these tests and field observations the Committee[']s recommendation is that the majority of Red Delicious are at optimum levels for long term storage and should be harvested.* When properly treated storage scald can be controlled. Slight watercore was observed in some sample orchards.

There was additional testimony that the rule of thumb and recommendations were merely guidelines to be balanced by the grower's discretion, particularly if good color was lacking at the time.

Although delay in harvest increased the possibility of physiological problems such as water core, internal browning, and internal breakdown, expert testimony established the entire industry was waiting longer than usual for color during the 1981 Red Delicious apple harvest. Brayland Red Delicious apples were picked and received at the Phillippi warehouse October 9 and October 29, 168 and 188 days,

respectively, after the bloom date. Manual slicing, pressure, and soluble solids tests indicated a slight water core problem. Because of the relatively small size of the apples, 70 percent of the Golden and 87 percent of the Red Delicious apples were placed in medium– or long–term controlled atmosphere (CA) storage.[2]

Phillippi Fruit's marketing agent was of the opinion the best sales would take place May through August 1982, so the Phillippis closed the plant January through March to install the new presizer. Few sales of Brayland apples took place during that period. One member of the Brayland Committee testified he personally observed the equipment installation, but stated he did not directly communicate information to the remaining investors because "they all knew it".

Between January and June, Phillippi records indicate temperature fluctuations in CA rooms where Brayland apples were stored. The Phillippis ascertained the cause of the problem was a faulty refrigeration system which they repaired in mid–May.

Approximately 17.5 percent of Brayland CA apples had been sold when the first Brayland apples came out of CA storage in April and May. A substantial portion of the unsold apples was affected by a condition known as internal browning. This industry–wide problem in 1982 resulted in reduced Brayland apple prices and gave rise to this suit seeking $331,122.55 in damages.

The trial court: (1) dismissed the Cusicks' claims based on fiduciary duty, negligence, the Consumer Protection Act, and the commission merchants act; (2) ruled the Phillippis were entitled to a judgment for overpayment; and (3) refused to assess costs and attorney fees. The Cusicks appeal and the Phillippis cross–appeal on fees.

We first consider whether the trial court erred in refusing

---

[2]In CA storage, the fruit is sealed in a room where the temperature is kept constant and oxygen and carbon dioxide levels are significantly reduced, leaving an atmosphere consisting primarily of nitrogen.

to hold the Phillippis to a fiduciary standard of care based on (1) their status as RCW 20.01 commission merchants; (2) their status as partners; and (3) the quasi–fiduciary theory established in *Hutson v. Wenatchee Fed. Sav. & Loan Ass'n,* 22 Wn. App. 91, 588 P.2d 1192 (1978) and *Boonstra v. Stevens–Norton, Inc.,* 64 Wn.2d 621, 393 P.2d 287 (1964).

## COMMISSION MERCHANT

In 1959, the Legislature enacted RCW 20.01 which pertains to commission merchants, dealers, brokers, buyers and agents dealing in agricultural products. It provides for the licensing of such persons and regulation of their activities by the Director of Agriculture. *Voelker v. Joseph,* 62 Wn.2d 429, 430, 383 P.2d 301 (1963); *Heart Seed Co. v. Chamnes,* 30 Wn. App. 689, 690, 637 P.2d 989 (1981). The parties do not dispute the Phillippis are commission merchants, defined in RCW 20.01.010(6) as:

> any person who receives on consignment for sale or processing and sale from the consignor thereof any agricultural product for sale on commission on behalf of the consignor, or who accepts any farm product in trust from the consignor thereof for the purpose of resale, or who sells or offers for sale on commission any agricultural product, or who in any way handles for the account of or as an agent of the consignor thereof, any agricultural product.

Commission merchants' responsibilities to principals include some aspects of both fiduciary and due diligence standards. *See* Annot., *Factor's Liability Based on Delay in Marketing and Selling Principal's Goods,* 3 A.L.R.3d 815, 816, 821 (1965); Annot., *Duty of Factor, Broker, or Commission Merchant With Respect to Care and Protection of Goods Intrusted to Him,* 17 A.L.R. 538, 539 (1922); and 32 Am. Jur. 2d *Factors and Commission Merchants* §§ 25, 26, at 20–22 (1982).

Because confidence and reliance are involved in the relationship, a commission merchant is bound to exercise the utmost good faith and loyalty toward the principal in order

to avoid self–dealing. *Bosma v. United States Dep't of Agriculture,* 754 F.2d 804 (9th Cir. 1984). The standard of care of a commission merchant has not been expressed in fiduciary terms in Washington, but certain duties have been recognized. In bankruptcy, for example, a commission merchant is not necessarily a "fiduciary", although in any agency some trust or fiduciary relation exists. *Taitch v. Lavoy,* 57 Wn.2d 857, 862, 360 P.2d 588 (1961). Commission merchants as agents are required to adhere faithfully to all instructions which can be properly carried out. *Mueller v. Staples & Son Fruit Co.,* 26 Wn. App. 166, 168–69, 611 P.2d 801 (1980). To be binding, however, the instructions must be clear and distinct. *Turner v. Crumpton & Crumpton,* 21 N.D. 294, 130 N.W. 937, 940 (1911). Additionally, the rule requiring open disclosure and full accounting has been applied to commission merchants. *Sherwood Bros. v. Seattle Fruit & Produce Auction Co.,* 93 Wash. 544, 548, 161 P. 371 (1916).

Finally, commission merchants must exercise ordinary care and diligence in the handling and protection of the property entrusted to them, that is that care and diligence a prudent businessman would exercise in the management of his own affairs. *Burke v. Napoleon Hill Cotton Co.,* 134 Ark. 580, 202 S.W. 827 (1918). The commission merchant is not an insurer, however, nor held to the highest degree of care. *Blanchard v. Elmer Wood Co.,* 204 Iowa 255, 214 N.W. 583, 584 (1927). Moreover, if selling the goods is left to the commission merchant's discretion, errors in judgment will not form a basis for liability. *Burke,* 202 S.W. at 829. Custom and usage in the locality may partially define a commission merchant's duty of care, but if specifically instructed to handle goods in a particular manner, local custom permitting a different method of handling is no excuse. *Lyons v. Donahue–Randall & Co.,* 107 Neb. 509, 186 N.W. 354, 355 (1922); 32 Am. Jur. 2d *Factors and Commission Merchants* § 31, at 25 (1982); *see also Mueller,* at 171.

Here, the evidence does not support a finding of self–

dealing. Therefore, it was not error for the court to focus on the clearly defined duties at issue—following instructions, open disclosure and full accounting, and due diligence in care and preservation of the entrusted goods, rather than to analyze these duties in express "fiduciary" terms.

## PARTNERSHIP

■■ An express or implied contract is essential to a partnership relationship and must contemplate a common venture uniting labor, skill or property of the partners for the purpose of engaging in lawful commerce for the benefit of all the parties, a sharing of profits and losses, and joint right of control of its affairs. *Eder v. Reddick,* 46 Wn.2d 41, 49, 278 P.2d 361 (1955). The relationship is not controlled by the name of the arrangement or by certain terms and labels, but in substance is derived from all the circumstances surrounding their relations. *Stipcich v. Marinovich,* 13 Wn.2d 155, 161, 124 P.2d 215 (1942). The essential test of the existence of a partnership is whether the parties intended to establish such a relation as manifested by their express agreement or inferred from their acts and statements. *In re Estate of Thornton,* 81 Wn.2d 72, 79, 499 P.2d 864 (1972) (quoting *Nicholson v. Kilbury,* 83 Wash. 196, 202, 145 P. 189 (1915)); *Eder,* at 49; *Kintz v. Read,* 28 Wn. App. 731, 734, 626 P.2d 52 (1981).

Here, the parties' intent was clearly spelled out in the cotenancy agreement, and there was no error in the trial court's determination that although some indicia of a partnership were present, the parties intended a tenancy in common. No partnership duties arose.

## QUASI–FIDUCIARY

The Cusicks cite *Boonstra v. Stevens–Norton, Inc., supra* at 625 and *Hutson v. Wenatchee Fed. Sav. & Loan Ass'n, supra* at 101 as authority for the rule articulated in Restatement (Second) of Torts § 551, at 119 (1977), that:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; . . .

Although comment *f* indicates tenants in common share the requisite relation of trust and confidence, this Restatement rule is applied in actions for fraud or negligent misrepresentation. No such allegations are present here; therefore, we decline to apply that rule under these facts.

█ The next issue is whether the trial court erred in failing to apply the doctrine of res ipsa loquitur to find negligence. That doctrine allows the trier of fact to draw an inference of negligence where (1) the injury is of a type which ordinarily does not occur absent someone's negligence; (2) the agency or instrumentality causing the injury was in the exclusive control of the defendant; and (3) the plaintiff did not contribute to the injury. *Metropolitan Mortgage & Sec. Co. v. Washington Water Power Co.,* 37 Wn. App. 241, 243–44, 679 P.2d 943 (1984).

The practical effect of the doctrine is to rely on circumstantial evidence to permit a presumption or inference of negligence and place upon the defendant the burden of coming forward with evidence rebutting or overcoming the presumption. *Metropolitan Mortgage,* at 243. Res ipsa loquitur will get the plaintiff past a nonsuit, but the trier of fact is under no obligation to draw the permissible inference. *Brauner v. Peterson,* 16 Wn. App. 531, 533, 557 P.2d 359 (1976).

In discussing the second necessary element, control, *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d 12, 19, 499 P.2d 1, 52 A.L.R.3d 1067 (1972) notes not only must the defendant have exclusive control over the instrumentality producing the injury, but there must be a corresponding lack of control by the injured party to take action on his own behalf to avert the injury.

Here, testimony established multiple possible causes for internal browning, with no evidence it would come about only due to someone's negligence. Moreover, no proof was offered the investors could not have directed the sale of

fruit at specific times during the storage period had they so chosen. In any event, since the Phillippis produced exculpatory evidence, the application of the doctrine would have been to little or no avail given trial court discretion in its use. The failure to apply the doctrine was not erroneous.

The Phillippis' duties included the avoidance of self-dealing, following instructions, open disclosure and full accounting, and ordinary care and diligence in handling entrusted property. Although the testimony was detailed and often conflicting, the trial court correctly found there were no specific instructions from the investors as to date of sale. On the contrary, there was testimony investor instructions were given to the effect decisions were to be left to the experts. Moreover, the monthly corporate printouts and the Phillippis' correspondence, including the November letter indicating their plan to exercise discretion, satisfied the full and open disclosure requirement. Timeliness, although an issue in light of the 2-month gap between transaction and computer report, was not so serious as to be considered breach of duty.

Testimony was presented that tended to establish lack of due diligence since there were no sales from January through March and temperature variations occurred over a 5-month period. However, Phillippis' marketing agents had advised them the highest volume of sales would not occur until late in the marketing year. Testimony also indicated there was widespread browning in virtually the entire industry. Under these facts, it is reasonable to conclude there was a failure of proof as to breach of duty and proximate causation. Although a commission merchant's duties are broader than those articulated by the trial court ("in accordance with the standards and practices in the industry"), the oral opinion, findings and conclusions demonstrated the court properly considered the relevant issues.

We next address whether the trial court erred in failing to find Phillippis violated the commission merchants act, RCW 20.01. The act governs the conduct of commission merchants. RCW 20.01.330 sets forth the grounds for revo-

cation of a commission merchant's license:

(2) That the applicant, or licensee, has failed or refused to render a true account of sales, or to make a settlement thereon, or to pay for agricultural products received, within the time and in the manner required by this chapter.

(3) That the applicant, or licensee, has made any false statement as to the condition, quality or quantity of agricultural products received, handled, sold or stored by him.

. . .

(5) That the applicant, or licensee, has intentionally made any false or misleading statement as to the conditions of the market for any agricultural products.

. . .

(13) That the applicant or licensee has, in the handling of any agricultural products, been guilty of fraud, deceit, or negligence.

. . .

(18) That the licensee has been guilty of fraud or deception in his dealings with purchasers including misrepresentation of goods as to grade, quality, weights, quantity, or any other essential fact in connection therewith.

The evidence supports the trial court's determination the statute was not violated since there was no failure to render a true account; no false statement as to the agricultural products received; no intentionally false or misleading statement as to the market; no negligence in handling; and no fraud, deception, or misrepresentation.

We need not address the Consumer Protection Act issue since, in the absence of a commission merchants act violation, there can be no "per se" basis to support the claimed violation.

■ Finally, we consider the Phillippis' cross appeal on the issue of attorney fees. Attorney fees are recoverable when authorized by a private agreement of the parties, a statute, or a recognized ground of equity. *Mellor v. Chamberlin,* 100 Wn.2d 643, 649, 673 P.2d 610 (1983); *Herzog Aluminum, Inc. v. General Am. Window Corp.,* 39 Wn. App. 188, 692 P.2d 867 (1984). The Cusicks' complaint spe-

158

cifically alleged a violation of the consulting agreement and expressly sought indemnification as well as attorney fees under the terms of the agreement.[3] Since the Phillippis were the prevailing parties, failure to award attorney fees was error. We remand to the trial court for a determination of reasonable attorney fees for trial and this appeal.

Judgment is affirmed as modified.

MCINTURFF, A.C.J., and MUNSON, J., concur.

Reconsideration denied December 13, 1985.

---

[3]The tenancy agreement, the pooling agreement, and the consulting agreement all contained provisions for attorney fees and costs to the prevailing party.