# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JOHN KENDALL, JR., an individual, and BELLUS MOTORS — SERVICE OFFROAD, a Washington partnership, | No. 58139-6-II |
| Respondents, | |
| v. | |
| ARTHUR WILLIAM ALLEN, an individual, and PACIFIC NW PERFORMANCE DIESEL, a Washington state sole proprietorship, | UNPUBLISHED OPINION |
| Appellants. | |

LEE, J. — Arthur William Allen, an individual and sole proprietor of Pacific NW Performance Diesel (PNWPD), appeals a judgment against him following a bench trial, which found that Allen formed a partnership, called Bellus Motors Service and Offroad (BSO), with Bellus Motors, LLC (LLC), a limited liability company owned by John Kendall, Jr. Specifically, Allen argues that there is insufficient evidence to support the finding of a partnership, and regardless, BSO never registered as a partnership and therefore had no capacity to sue. Allen also argues that the trial court's damage calculations, based on the finding of a partnership, are not supported by evidence in the record.

Because the facts do not support the conclusion that Allen formed a partnership with the LLC, as defined by RCW 25.05.055, we reverse the trial court's finding of a partnership. Because we hold no partnership was formed, we do not address whether BSO had capacity to sue or the

trial court's damage calculations. Accordingly, we reverse the judgment against Allen and remand to the trial court to resolve other causes of action not ruled on by the trial court.

FACTS

A.    BACKGROUND

Kendall is the owner and sole member of the LLC.[1]  The LLC sells used trucks.  In 2015, Kendall started an auto service side to his business for customers who bought trucks from him.  In 2016, Kendall leased a space in Camas for the service shop, and in 2017, began acquiring equipment and building out the space.

Kendall wanted to expand his LLC's service operations.  In late 2018, Kendall met Allen through mutual connections.

Allen is the sole proprietor of PNWPD.  Allen previously worked at an auto shop in Oregon, but wanted to begin his own diesel performance business.  At the time he met Kendall, Allen had been running his business on a friend's personal property.

Allen wanted to lease a space for PNWPD's service operations.  Although Kendall did not believe he had the ability to sublease his space in Camas, he and Allen met and discussed doing business with one another.  Specifically, Kendall wanted Allen, based on Allen's skillset, to help expand the LLC's diesel service center but have each party maintain their separate entities. Kendall and Allen had multiple conversations, and according to Kendall, developed a "rough draft" agreement.  Verbatim Rep. of Proc. (VRP) (Dec. 28, 2022) at 31.

---

[1]  The only explicit reference in the record to Kendall being the sole member of the LLC is in a motion submitted by Allen in the trial court.  However, the parties do not dispute that Kendall is the sole member of the LLC.

The rough draft agreement, titled "Service Partnership Proposal," provided that the LLC and PNWPD would equally share responsibility of rent, insurance, and utilities. Ex. D109, at 1.[2] The rough draft agreement also stated that the LLC would market and brand PNWPD with its own clothing and marketing material and that Allen would have "[f]ull access to the Bellus Service and off-road account, however checks from this account to any vendors will need dual authorization signatures." Ex. D109, at 1. As to profit-sharing, the rough draft agreement stated:

> [The LLC] proposes a 60/40 split of net after cost profit for the . . . first 6 months (can be extended to 12) in PNWPD favor. The contingency is that 10% is deposited into an account for PNWPD to create cushion and stability and eventually allow [the LLC] to not have to take on full responsibility of cash flow requirements. Once this is achieved in the 6-12 [month] period then all revenue shares will go to a 50/50 split as well as cost of materials and supplies.

Ex. D109, at 2. Kendall also wanted a two-year commitment from Allen based on the contribution of Kendall's ongoing service operations and the additional capital Kendall planned to invest. Neither Kendall nor Allen signed the rough draft agreement. According to Allen, he never saw the rough draft agreement.

Allen told Kendall that he was not interested in partnering with anyone. Additionally, Allen did not want to commit to the two years that Kendall wanted. Nevertheless, at the end of January 2019, Allen called Kendall and expressed a desire to obtain a space for PNWPD's operations and "to get started right away." VRP (Dec. 30, 2022) at 231. Kendall agreed and Allen began moving his own property into the LLC's Camas space in early February 2019.

---

[2] Ex. D109 does not contain page numbers. For the purposes of our opinion, we number the pages of Ex. D109 1- 2 starting from the first page of the exhibit.

Kendall began purchasing equipment to further build out the service operations and a space for Allen to work in. For instance, Kendall installed a second hydraulic lift specifically for Allen to use. Kendall also created new workstations and bought additional tools.

In mid-February, Kendall and Allen went to Wells Fargo to set up a bank account for their service operations. The name on the bank account was "Bellus Motors Service and Offroad." Ex. D101, at 23. However, the bank account owner was the LLC, and the account was registered under the LLC's employer identification number (EIN). Kendall deposited $1,000 into the bank account to open it. The account was a dual signature account with Kendall and Allen as the authorized signers. Kendall then began transferring receivables for works in progress, as of February 1, from the LLC's service operations into the BSO account.

Allen received a debit card for the BSO bank account, and Kendall also gave Allen a credit card with a $30,000 line of credit. Allen's debit card was a Wells Fargo business debit card with "Bellus Motors LLC" listed beneath his name. Ex. 2, at 1. Allen understood the BSO bank account as for PNWPD's sole use. According to Allen, he agreed to use the BSO bank account because Kendall allegedly wanted to be able to "monitor the checking account" to ensure Allen could cover his expenses. VRP (Dec. 30, 2022) at 236. Allen began using the BSO bank account for business operations.

Around this time, Kendall and Allen met with Ernie Nicholson, Kendall's attorney, to finalize the rough draft agreement into a formal contract. Nicholson provided a draft "Services and Accounting Agreement" based on the rough draft agreement. Ex. D108, at 1.

The draft Services and Accounting Agreement was between the LLC and PNWPD. The draft services agreement stated: "This Agreement is intended to create, and creates, a contractual relationship and is not intended to create, and does not create, any agency, partnership, joint venture or any like relationship between the parties hereto." Ex. D108, at 1. The draft services agreement also provided that the LLC and PNWPD would equally split rent, insurance, utilities, equipment costs, and maintenance. Additionally, the draft services agreement stated the same terms of splitting revenues as did the rough draft agreement.

Allen felt the draft services agreement was one-sided and made him appear as "a Bellus employee." VRP (Dec. 30, 2022) at 232. Additionally, Allen did not want to be "locked" in to any particular location for PNWPD's operations. Ex. D101, at 34. Kendall then re-proposed the terms of the original rough draft agreement and to "shake hands" on it; if Allen disagreed, then they could part ways. Ex. D101, at 34. Kendall was unwilling to agree to any different terms because he had "already purchased all the equipment[,] . . . extended the line of credit, [and] opened up all the accounts." VRP (Dec. 28, 2022) at 32.

Ultimately, Kendall and Allen agreed to split profits; Kendall would take a "cut" at the end of the year while Allen would take monthly draws of $4,200. VRP (Dec. 28, 2022) at 33. Allen officially moved in and began working in March 2019. Allen used the tools and programs that the LLC had provided.

Kendall and Allen never executed the rough draft agreement or finalized any contract. Additionally, neither party registered BSO as a partnership. While BSO had a separate bank account, all operations and reporting otherwise ran through the LLC. For instance, taxes, along

with insurance and licensing fees, were paid under the LLC, with the BSO bank account reimbursing the LLC for its proportionate share. BSO paid its share of rent and utilities to the LLC, which made the actual rent and utilities payments. Kendall and Allen had an arrangement such that BSO paid its rent the following month; for instance, BSO paid its March rent in April.

BSO employees were paid from the BSO bank account; however, they were paid as W-2 employees of the LLC, licensed and bonded under the LLC, and registered under the LLC's insurance. Additionally, Allen's monthly "draws" were reported as 1099 contractor[3] payments and Allen viewed his draws as a monthly paycheck. Kendall viewed Allen as a 1099 contractor.

Kendall and Allen communicated daily about business operations, via both text and email. Allen used the LLC's vendor accounts for the service operations. Kendall and Allen regularly discussed personnel changes, such as hiring and terminating employees. Kendall often introduced Allen to others as his business partner, which Allen never objected to. Additionally, Kendall and Allen jointly marketed their operations under the slogan of "Big Bad A[**] Trucks." VRP (Dec. 29, 2022) at 107.

In January 2020, when Kendall was reconciling accounts for 2019, Kendall noticed a discrepancy in the BSO bank account. Specifically, BSO's gross sales did not match the BSO account's deposits. Kendall asked Allen to look into the discrepancy. However, Allen never followed up.

---

[3] 1099 contractors, or independent contractors, are individuals who are in business for themselves as opposed to W-2 employees. *See generally Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 871, 281 P.3d 289 (2012); *Form 1099-NEC & Independent Contractors*, IRS, https://www.irs.gov/faqs/small-business-self-employed-other-business/form-1099-nec-independent-contractors (last visited April 2, 2024).

After finding the initial discrepancy, Kendall began conducting monthly account audits. Kendall began finding additional discrepancies. When discrepancies arose, Kendall and his bookkeeper asked Allen for documentation or receipts. According to Kendall, Allen never took action regarding the discrepancies nor provided the requested documentation.

Kendall also noticed withdrawals of cash and cashier's checks from the BSO bank account. Kendall did not know of any reason that Allen would need to make cash withdrawals, particularly in light of Allen's debit card. Kendall later discovered that the bank tellers had not realized the BSO bank account required dual signatures for check and cash withdrawals, which was why Allen was able to make withdrawals without Kendall's signature. By September 2020, Kendall noticed "huge discrepancies" in terms of gross sales versus deposits. VRP (Dec. 28, 2022) at 93. Kendall noted that checks were not getting deposited into the BSO account. Additionally, Kendall discovered that Allen used the LLC's business account with a vendor to receive a discount on personal purchases, paid through the BSO bank account, and for which he never reimbursed the BSO account.

Kendall decided to part ways with Allen. Allen requested a number from Kendall for a possible buyout. Kendall informed Allen that he would provide a number, but Kendall first wanted to "square up" on the equipment, money spent, accounts receivable, and ongoing projects. VRP (Dec. 28, 2022) at 95. Kendall's intention was to have everything reconciled and separated by December 31. Kendall informed Allen of his plan, and Allen agreed.

In October 2020, Allen informed Kendall that he intended to move out of the Camas location by the end of the month. Allen had secured a new location for a service shop. Allen then

7

withdrew all remaining cash from the BSO bank account, with the exception of the $1,000 that Kendall had initially deposited. Allen believed that all the funds in the account belonged to him.

Allen then removed all the equipment and cars from the Camas location. Allen also removed the software program that tracked ongoing work projects. Kendall called the police; however, the police told him it was a civil matter and did not intervene. Later, customers arrived at the service shop to pick up their vehicles that Allen had removed; Kendall had to direct the customers to Allen's new location. Following Allen's departure, Kendall paid taxes and fees for the service shop out of his own pocket, including the BSO share of October rent.

B. PROCEDURAL HISTORY

In November 2020, Kendall, in his individual capacity, and BSO, "a Washington partnership," filed a complaint against Allen and PNWPD. Clerk's Papers (CP) at 1. The complaint alleged that Kendall and Allen entered into a partnership called "Bellus Motors – Service Offroad." CP at 2. The complaint stated nine causes of action: (1) violation of the Washington Uniform Partnership Act, chapter 25.05 RCW; (2) breach of partnership agreement; (3) conversion; (4) improper distributions; (5) failure to make contributions; (6) breach of fiduciary duties; (7) fraud; (8) judicial determination of expulsion of Allen from the partnership; and (9) judicial determination of dissolution of partnership.

In his answer to the complaint, Allen denied the existence of a partnership. As an affirmative defense, Allen stated that Kendall had failed to state a claim upon which relief could be granted.

In May 2021, the parties filed a joint status report with the trial court. In the joint status report, Kendall confirmed that all appropriate parties and claims had been joined pursuant to CR 18, 19, or 20. The parties requested a two-day bench trial.

In November 2022, Allen filed a motion to amend his answer, add a third-party complaint, and to reopen limited discovery. Allen requested that the trial court permit him to amend his answer to add the LLC as an additional party, assert an affirmative defense of offset, and to reopen discovery as it pertained to the LLC's tax returns. Allen argued that if a partnership existed, it was between Allen and the LLC. Allen also argued that BSO was not registered as a partnership and "may be properly construed as a de facto [doing business as] of Bellus Motors LLC." CP at 63. In support of his motion, Allen attached a copy of the draft service agreement drawn up by Nicholson, indicating that the LLC was one of the intended parties. Kendall did not object to adding the LLC as a party; however, he objected to adding claims against the LLC and reopening discovery.

On December 1, the trial court held a hearing on Allen's motion to amend his answer. The trial court noted that neither party had ever attempted to add the LLC as a party throughout the history of the action, and moreover, the parties had verified in the May 2021 joint status report that all claims and parties were properly added. The trial court denied Allen's motion.

The bench trial began on December 28. During opening statements, Kendall's counsel emphasized the alleged partnership dispute between Kendall and Allen. Conversely, Allen's counsel argued that no partnership existed and requested the trial court to find no partnership, fraud, or conversion.

The trial court asked Kendall's counsel if Kendall intended to pursue his fraud and conversion claims. Kendall's counsel initially replied, "No." VRP (Dec. 28, 2022) at 21. However, Kendall's counsel then clarified with the trial court:

> [KENDALL'S COUNSEL]: We . . . have those claims, Your Honor. The fraud claim, I don't think there's—we'll—the thrust of the complaint is really these partnership issues and accounting of the partnership.
>
> [TRIAL COURT]: Okay.
>
> [KENDALL'S COUNSEL]: It's just that if for some reason there's not a partnership or that he was a 1099 independent contractor or something like that, I think that was when the conversion claim would kick in and essentially, you know, if there's no partnership, then those were assets of the LLC. And so it's kind of a— it's more of an alternative claim, so the thrust of it would be the partnership action.
>
> [TRIAL COURT]: Well, thank you. That clarifies it.

VRP (Dec. 28, 2022) at 22.

During trial, witnesses testified as described above. Additionally, both Kendall and Allen submitted as exhibits various bank statements, receipts, check copies, tax documents, and text and email exchanges in support of their arguments.

After the presentation of Kendall's case, Allen moved for a directed verdict pursuant to CR 41. Allen argued that all claims should be dismissed. Specifically, Allen argued that the evidence demonstrated that BSO was not a partnership, so any claims under Washington's partnership statute should fail. In the alternative, Allen argued that the LLC was an indispensable party and the suit should be dismissed for failure to join the LLC, and that the evidence did not support claims of fraud or conversion.

The trial court asked Kendall's counsel if the argument was that the LLC was the partner in the purported partnership, and since the LLC was not a named plaintiff, why the trial court should not grant Allen's motion. Kendall's counsel responded:

> Mr. Kendall has testified in that particular example that he paid the excise tax, so that puts him individually as someone and not the LLC paying it. So there's a . . . fundamental difference between the LLC running the sales side and this partnership running the service side and so the partnership itself is a plaintiff to this action, Bellus Motors Service Offroad, a Washington partnership.
>
> So the Court can find two things: The Court can say, okay, Mr. Kendall was the partner and not the LLC, so he's the plaintiff individually; and the Court can also find that the partnership existed, that it was between an LLC and Mr. Allen, in which case we still have claims because a partnership is allowed to bring claims in and of itself and we've brought those under the name of the partnership. And, further, if . . . there's any doubt, we can bring a motion for a CR 15(a) to amend to conform to evidence as far as if the LLC is involved, but all the parties—the real parties at interest are present in the courtroom today.

VRP (Dec. 30, 2022) at 218-19. The trial court denied Allen's motion for directed verdict.

Following trial, the trial court entered judgment in favor of BSO and Kendall, and against Allen and PNWPD, for $70,796.28. The trial court also entered findings of fact (FOF) and conclusions of law (COL).

The FOFs stated, in relevant part:

> 3. Kendall and Allen were introduced by a mutual business acquaintance in November 2018. After some discussion, Kendall and Allen agreed to create a business venture between Bellus Motors LLC, owned by Kendall, and Pacific NW Performance Diesel, owned by Allen. The new venture was to be named Bellus Motors Service and Offroad and was to be located in facilities in Camas, Washington, with Bellus Motors LLC. The new venture was to be marketed jointly with the previously created entities.
>
> 4. Kendall and Allen attempted to formalize the details of this new business arrangement by various written documents, including drafts of a written contract. Unfortunately, they were unable to reach agreement on these terms and

11

no written agreement was adopted by both parties. However, in March 2019 the parties agreed orally that Allen would commence to operate the service business of [BSO] and that the parties would share assets and liabilities of this venture and share its profits.

5. Kendall and Allen created a separate account for [BSO]. Bellus Motors LLC provided tools and equipment for the initial operation, and additional tools, equipment and inventory were purchased. Kendall and Allen were both required to sign checks for withdrawals from the service account, although Allen had some ability to remove funds for parts and other business payments. Bellus Motors LLC insured employees, and maintained payroll and bookkeeping service for [BSO] and its employees. Allen took regular draws from the business by agreement and removed additional funds without advance approval or accounting.

6. Plaintiff and defendant both worked closely together to operate the service business, to jointly market it with their other businesses and to expand the operation and make it successful. In 2020, disputes arose between the parties concerning the operation of [BSO] and the accounting of its income and assets. Kendall and Allen agreed to end their business venture but did not come to agreement on the specific terms of this dissolution. In October 2020, Allen summarily vacated the premises shared with Bellus Motors LLC and moved service operations to a location that he alone controlled. Allen removed tools and equipment purchased for the joint business venture, along with most of the funds in the business account and all customer work then in progress.

7. Allen failed to reimburse [BSO] for purchases for his personal vehicle. Allen also failed to pay his share of expenses owed to [BSO] for October 2020, as well as his share of tax and other liabilities owed by [BSO] for a portion of the fourth quarter of 2020. Kendall was forced to pay these expenses, and other remaining expenses of [BSO], either from his personal funds or from the funds of Bellus Motors LLC.

CP at 141-43. The COLs stated, in relevant part:

2. Beginning in March 2019, [BSO] was a business partnership owned jointly by Bellus Motors LLC and Arthur William Allen, dba as Pacific NW Performance Diesel. The partnership's business operations were primarily the responsibility of the owner and operator of Bellus Motors LLC, John Kendall. The partners agreed to share revenue and expenses of this business and to equally divide its profits. The partnership was in existence from March 2019 through October 2020.

3.	The partnership should be dissolved as of October 31, 2020, its business affairs wound up and any remaining assets and liabilities distributed.

4.	Defendant Allen received a disproportionate share of the partnership assets at the conclusion of its business operations. Those assets included tools and equipment purchased for [BSO], with a market value of $22,518.00; and funds for the period from July 2020 through September 2020, in the amount of $61,400.44. Allen should reimburse the partnership for one-half of these amounts, a total of $41,959.22.

5.	In addition, Allen should reimburse the partnership for one-half of the net profit for work in progress in October and November 2020. A reasonable estimate of this profit is 42,329.06. Allen should reimburse the partnership for one-half this amount, a total of $21,164.54.

6.	Allen should reimburse the partnership for $756.00 for personal purchases and $3,729.52 for a portion of October 2020 expenses. Allen is also responsible for one-half of one-third of the fourth quarter tax and liability payments, in the amount of $1,906. The total of these reimbursements is $6,391.52.

CP at 143-44.

Allen appeals.

ANALYSIS

Allen argues that the trial court's judgment is void because BSO did not have capacity to sue under RCW 19.80.040. Allen also argues that the trial court erred in finding an enforceable partnership between Allen and the LLC. Finally, Allen argues that the trial court's award of damages to Kendall was not supported by the evidence.

We hold that the trial court erred in concluding that Allen and the LLC formed a partnership. Because there was no partnership, we do not address Allen's other arguments.

13

A.      CAPACITY TO SUE AND SUBJECT MATTER JURISDICTION

Initially, we address Allen's challenge to BSO's capacity to sue under RCW 19.80.040. RCW 19.80.040 provides in part: "No person or persons carrying on, conducting, or transacting business under any trade name shall be entitled to maintain any suit in any of the courts of this state until such person or persons have properly completed the registration as provided for in RCW 19.80.010." It is undisputed that BSO was never registered as a partnership with the state. And, as discussed below, we reverse the trial court's finding that a partnership existed. Therefore, we do not address whether BSO had capacity to sue.

Allen also argues that because BSO lacked capacity to sue under RCW 19.80.040, the trial court lacked subject matter jurisdiction[4] and the judgment is void. However, this argument fails to acknowledge that Kendall was also a plaintiff in his individual capacity. Kendall is the sole member of the LLC. During trial, Kendall testified to instances where he paid funds out of pocket. The conversion claim was an independent, "alternative" claim that did not rely on the existence of a partnership. VRP (Dec. 28, 2022) at 22. Because Kendall paid funds out of pocket, his right to

---

[4] Subject matter jurisdiction refers to the authority of the trial court to hear and determine the *type* of case at issue. *Amy v. Kmart of Wash., LLC*, 153 Wn. App. 846, 852, 223 P.3d 1247 (2009). The type of case or controversy refers to the general category of a case and the nature of the relief sought, not whether the trial court may adjudicate a specific case. *Dougherty v. Dep't of Lab. & Indus.*, 150 Wn.2d 310, 317, 76 P.3d 1183 (2003). Superior courts are courts of general jurisdiction and "shall have original jurisdiction in all cases at law . . . in which the demand or the value of the property in controversy amounts to three thousand dollars or as otherwise determined by law." WASH. CONST. art. IV, § 6. This case pertains to property valued at more than $3,000. For this reason and the reasons discussed in this section, the trial court had subject matter jurisdiction.

recover could still be vindicated under the conversion claim. Therefore, Kendall had standing to sue and the trial court did not lack subject matter jurisdiction.

B.     STANDARD OF REVIEW

Following a bench trial, the trial court's findings of fact are reviewed for substantial evidence. *Herdson v. Fortin*, 26 Wn. App. 2d 628, 636, 530 P.3d 220, *review denied*, 2 Wn.3d 1009 (2023). Substantial evidence is evidence sufficient "'to persuade a rational, fair-minded person of the truth of the finding.'" *Chiu v. Hoskins*, 27 Wn. App. 2d 887, 892, 534 P.3d 412 (2023) (internal quotation marks omitted) (quoting *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688 (2007)), *review denied*, 2 Wn.3d 1018 (2024). "We review conclusions of law de novo to determine if they are supported by the findings of fact." *Alexandria Real Est. Equities, Inc. v. Univ. of Wash.*, ___ Wn. App. 2d ___, 539 P.3d 54, 64 (Wash. Ct. App. 2023), *pet. for review filed*, 1027133 (Jan. 4, 2024). Unchallenged findings are treated as verities on appeal. *Id.*

Here, Allen does not challenge any specific findings of fact. Therefore, we treat the trial court's findings as verities on appeal. *Id.*

In his briefing, Allen also does not assign error to specific conclusions of law. Instead, Allen merely asserts that the trial court erred in finding the existence of a partnership based the facts. Later, in the "Statement of the Case" section of his brief, Allen identifies COL 4 and COL 5—though not by name—as unsupported by the factual findings.

Generally, parties must assign error to specific findings of fact and conclusions of law. RAP 10.3(g). However, "[i]n appropriate circumstances, we will waive technical violations of

15

RAP 10.3(g) . . . where . . . the appellant's brief makes the nature of the challenge clear." *Harris v. Urell*, 133 Wn. App. 130, 137, 135 P.3d 530 (2006), *review denied*, 160 Wn.2d 1012 (2007).

Here, Allen does not appear to challenge the trial court's findings of fact; rather, Allen appears to challenge the trial court's legal conclusions. And it is relatively clear that the thrust of Allen's challenge is to the trial court's conclusion that a partnership existed between the LLC and Allen. Thus, we waive any technical violation of RAP 10.3(g) and address Allen's challenge to the trial court's conclusion that a partnership existed between the LLC and Allen.

C.      WASHINGTON REVISED UNIFORM PARTNERSHIP ACT

1.      Legal Principles

Under Washington's Revised Uniform Partnership Act, chapter 25.05 RCW, a partnership is generally formed when "two or more persons . . . carry on as co-owners [of] a business for profit . . . whether or not the persons intend to form a partnership." RCW 25.05.055(1); *see* RCW 25.05.005(6). Whether the parties intend to form a partnership is a question of fact. *Curley Elec., Inc. v. Bills*, 130 Wn. App. 114, 116, 121 P.3d 106 (2005), *review denied*, 158 Wn.2d 1007 (2006).

A partnership requires an express or implied partnership contract, "manifested by all facts and circumstances, including the parties' actions and conduct." *DeFelice v. Emp't Sec. Dep't*, 187 Wn. App. 779, 789, 351 P.3d 197 (2015); *see* RCW 25.05.005(7) ("'Partnership agreement' means the agreement, whether written, oral, or implied, among the partners concerning the partnership."). The contract "must contemplate a common venture uniting labor, skill or property of the partners for the purpose of engaging in lawful commerce for the benefit of all the parties, a sharing of profits and losses, and joint right of control of its affairs." *Cusick v. Phillippi*, 42 Wn. App. 147,

154, 709 P.2d 1226 (1985). In determining the existence of a partnership, no one fact or circumstance is conclusive. *Eder v. Reddick*, 46 Wn.2d 41, 50, 278 P.2d 361 (1955).

"The burden of proving a partnership rests upon him who alleges it." *Bengston v. Shain*, 42 Wn.2d 404, 409, 255 P.2d 892 (1953). Simply calling a business arrangement a partnership is not sufficient to create a partnership. *DeFelice*, 187 Wn. App. at 790. "Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property." RCW 25.05.055(3)(a). Additionally, "sharing of gross returns does not by itself establish a partnership." RCW 25.05.055(3)(b). A person who receives a share of the profits is presumed to be a partner unless the profits were received in payment for "services as an independent contractor or of wages or other compensation to an employee." RCW 25.05.055(3)(c)(ii).

### 2. Insufficient Evidence of a Partnership

Allen argues there was no partnership because the LLC and BSO are the same entity and all business operations were organized and reported under the LLC. Allen further argues that he was paid as a 1099 contractor, which precludes a finding of a partnership under RCW 25.05.055. We agree with Allen that there was no partnership.

Here, the record shows that Allen and Kendall never signed or executed a partnership agreement. While a signed, written agreement is not required for finding that a partnership exists, Allen testified that he told Kendall he had no desire to form a partnership. The record also shows that Kendall and Allen were not equal partners because all business operations ran through the

LLC, owned by Kendall—there was no joint ownership or joint right of control. *See DeFelice*, 187 Wn. App. at 788. And the record shows that the LLC and BSO shared the same EIN, which implies the LLC and BSO are actually the same entity. Further, the LLC was the account *owner* of the BSO bank account while Allen was only an authorized signer. Accordingly, even though Allen had access to the bank account's funds, Kendall possessed ultimate control as the owner and sole member of the LLC. Additionally, taxes were paid through the LLC, and BSO employees were registered and licensed under the LLC.

The evidence also shows that even though Allen and Kendall agreed to share profits, Allen functionally received monthly paychecks. Allen's "draws" were a set monthly amount— seemingly unrelated to any actual profits of the business—and were reported as 1099 contractor payments. Indeed, Kendall viewed Allen as a 1099 contractor. A person who receives profits in the form of payment for services as an independent contractor or of wages precludes a finding that that person was a partner in a partnership. RCW 25.05.055(3)(c)(ii). Moreover, while the record shows that the parties agreed to share expenses, the record is devoid of any evidence regarding the sharing of losses. *Cusick*, 42 Wn. App. at 154.

Kendall has the burden of proving the existence of a partnership. *Bengston*, 42 Wn.2d at 409. Kendall argues that Allen's conduct with Kendall; specifically, Allen's agreement to share profits and expenses; daily communication about business operations; and Allen's use of tools, equipment, databases, and the bank account all demonstrate the formation of a partnership. However, such conduct is not exclusive to a partnership; it could arise in any number of non-

18

partnership business arrangements. Simply calling a business arrangement a partnership is not sufficient to create a partnership. *DeFelice*, 187 Wn. App. at 790.

Based on the evidence presented at trial, the facts do not support the conclusion that Allen and the LLC entered into a partnership as contemplated under RCW 25.05.055. *Chiu*, 27 Wn. App. 2d at 892. Therefore, we reverse the trial court's finding that Allen and the LLC entered into a partnership and remand to the trial court to determine causes of action not addressed in the trial court's FOFs and COLs.[5,6]

ATTORNEY FEES ON APPEAL

Both Allen and Kendall request attorney fees on appeal. Allen requests attorney fees on appeal pursuant to RCW 4.84.185 and RAP 18.1(a), and Kendall requests attorney fees pursuant to RAP 18.9. While we reverse the trial court's finding of a partnership, there are still claims to

---

[5] While we hold that the facts do not support a finding of a partnership, Kendall's complaint also listed conversion as a possible cause of action. Allen argues that Kendall "made no substantive argument regarding conversion" during the trial, nor did he "cross-appeal the issue." Br. of Appellant at 22, n.4. Allen contends that he took only his own property and that even if a partnership existed, he is not liable for conversion because he has an interest in partnership property as a purported partner.

However, the record shows that Kendall argued conversion in the alternative at trial court. Because the trial court found the existence of a partnership, the court simply did not address Kendall's claim for conversion. Accordingly, it is not clear what Kendall would have cross-appealed. Moreover, there is considerable evidence in the record, including bank and tax statements, receipts, and invoices showing that either Kendall or the LLC purchased the materials and equipment that Allen allegedly took with him when he vacated the premises. On remand, the trial court should determine whether sufficient evidence supports a cause of action for conversion.

[6] Because we hold that the facts do not support the trial court's conclusion that there is a partnership between the LLC and Allen, we do not address Allen's challenge to the trial court's award of damages.

be addressed by the trial court on remand.  Therefore, the prevailing party has yet to be determined; the issue of attorney fees should be determined by the trial court on remand upon resolution of the remaining causes of action.

## CONCLUSION

We reverse the trial court's conclusion that there is a partnership between the LLC and Allen and remand to the trial court to determine the remaining causes of action the trial court did not address.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, J.

Cruser, C.J.