[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15207
_____

D.C. Docket No. 0:08-cv-60296-MGC

ZAKI KULAIBEE ESTABLISHMENT,
a company formed under the laws of
the Kingdom of Saudi Arabia,

Plaintiff - Appellant,

versus

HENRY H. MCFLIKER,
a natural person,
a.k.a. Harris H. McFliker,
a.k.a. Harold McFliker,
AYODH PERSAUD,
a natural person,
a.k.a. Joe Persaud,
SHAMMIE PERSAUD,
a.k.a. Bebe Nafessa Persaud,
a.k.a. Be Be N. Persaud,
a.k.a. Bi Bi N. Persaud,
AIRSPARES NETWORK, INC.,
a Florida corporation,
DAYTONA AEROSPACE, INC.,
a Florida corporation, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(November 18, 2014)

Before TJOFLAT, Circuit Judge, MOORE,[*] and SCHLESINGER,[**] District Judges.

TJOFLAT, Circuit Judge:

Zaki Kulaibee Establishment ("Zaki"), a Saudi Arabian company, contracted with Airspares Network, Inc. ("ANI"), a Florida-based aircraft parts dealer, to sell a large shipment of aircraft parts on consignment. Zaki claims ANI breached the contract by selling Zaki's parts without properly accounting for the sales proceeds, charging Zaki for inflated storage expenses, and failing to return the parts after Zaki terminated the consignment agreement. Zaki sued for breach of contract and conversion, among other things. Noting that ANI possessed both the relevant records and all of Zaki's remaining parts, Zaki also requested an accounting. The District Court refused to order ANI to account, holding that Zaki had an adequate remedy at law. We conclude that this was error and remand for an accounting.

_____

[*] Honorable K. Michael Moore, Chief U.S. District Judge for the Southern District of Florida, sitting by designation.

[**] Honorable Harvey E. Schlesinger, U.S. District Judge for the Middle District of Florida, sitting by designation.

I.

A.

In 1999, Zaki purchased a large collection of new and used military aircraft parts at an auction held by the Royal Saudi Air Force.[1]  Zaki then began reselling the parts online.  ANI purchased several of the parts in the course of its business and eventually contacted Zaki about the possibility of selling parts on consignment for Zaki in the United States.  In June 2003, Zaki al-Kulaibee, Zaki's owner and president, and Abdurahman Saud, Zaki's business director, traveled to Florida to meet with Henry McFliker, ANI's founder and past president, and Ayodh Persaud, ANI's current president, to discuss the potential relationship.  ANI's lawyers drew up a draft Consignment Services Agreement (the "CSA") designating ANI as Zaki's "agent and consignee," and after some negotiation, Mr. Zaki and Mr. Persaud executed the agreement.   In the CSA, Zaki agreed to ship its parts to ANI in Florida, and ANI promised to store and market the parts.  In return, ANI would retain as its commission 100 percent of the first $1 million in sales, 75 percent of the next $1 million, and 50 percent of all sales above $2 million.  In the CSA, the parties estimated the aggregate retail value of the parts to be $500 million.

---

[1] The lot included parts for Lockheed C-130 Hercules transport planes, Boeing KC-135 Stratotankers, and Boeing 707 Airborne Warning and Control System ("AWACS") planes.

Under the CSA, (which the parties agreed would be construed according to Florida law) ANI would hold the parts for the sole purpose of selling them on Zaki's behalf, Doc. 99-1, at 8, § 9,[2] but Zaki retained title to the parts until sold, id. at 7, § 7.  ANI agreed to segregate Zaki's parts from its other products, id. at 3, § 4(a); to insure the parts and include Zaki as an additional named insured on the policy, id.;  and to "diligently and in good faith use its best efforts" to sell the parts at fair market value, id. at 4, § 4(c).  The CSA also tasked ANI with several reporting obligations: to provide a sales report "each month during the Term" for all sales of its parts from the preceding month, id. at 4–5, § 4(e); to maintain records of all sales of Zaki's parts, id., § 4(g); to open its books and records to Zaki's inspection on request "to ensure correct computation of the payments due [Zaki]," id.; to provide regular sales and inventory reports to Zaki on reasonable request, id.; and to allow Zaki "to conduct an audit of any such reports and records relating to [Zaki's parts]" on reasonable notice, id.

The initial consignment term was to last five years, but would continue automatically for one-year intervals absent express termination by either party.  Id. at 8, § 8(a).  Section 4(f) of the CSA provided that if, after the initial term, Zaki

---

[2] All docket citations refer to the District Court docket, Zaki Kulaibee Establishment v. Henry H. McFliker, No. 08-cv-60296 (S.D. Fla.).

4

wanted all or substantially all of the parts returned, it must first terminate the agreement.[3] Section 8(c) further provided, in some tension with § 4(f), that if either party terminated the relationship, ANI had the option to continue selling any consigned parts still in its possession.[4]

ANI wired an initial deposit to cover shipping costs, and Zaki sent the first lot of parts, contained in 115 forty-foot shipping containers, during the summer of 2003. Because of the sheer number of parts involved—approximately 150,000 line items of inventory, comprising around 5,000,000 individual parts—ANI felt that the time and expense involved in conducting an intake inventory, a process that

---

[3] Section 4(f) of the CSA reads in pertinent part:

After the Initial Term, [Zaki] may demand that [ANI] return any, but not all or substantially all, unsold Consigned Goods in its possession, in which case [ANI] shall promptly return such requested Consigned Goods to [Zaki] at [Zaki's] expense. If [Zaki] desires after the Initial Term that [ANI] return all or substantially all unsold Consigned Goods in its possession, it may do so only by terminating this Agreement pursuant to Section 8(b) hereof [setting out the procedures for termination]. This Section 4(f) shall survive the expiration or termination of the Agreement, for any reason whatsoever.

Doc. 99-1, at 5.

[4] Section 8(c) of the CSA reads in pertinent part:

Each party hereby agrees that in the event of any termination of this Agreement, [ANI] may, at its sole option, (i) sell any Consigned Goods on hand and unsold pursuant to the terms and conditions of this Agreement, or (ii) return any such Consigned Goods to [Zaki] at [Zaki's] expense. Upon [ANI's] return to [Zaki] of all unsold Consigned Goods after termination of this Agreement, all parties shall be discharged of their obligations under this Agreement.

Doc. 99-1, at 8.

5

would entail opening each box and physically verifying the quantity and condition of each part, would be prohibitive. Accordingly, ANI simply adjusted its inventory to reflect the number of parts included on the inventory list Zaki had provided.

B.

Zaki received the first sales report from ANI in December 2003. Noticing that the report appeared to be incomplete, Zaki sent representatives to Florida to inquire further. Upon investigation, Zaki uncovered what it believed to be a pass-through scheme between ANI and five other companies,[5] all selling aircraft parts, most operated out of the same location by the same people.[6] According to Zaki, ANI had divvied up Zaki's inventory amongst these affiliated entities and allowed them to list and sell Zaki's parts online in their own names. When an affiliated company sold one of Zaki's parts, it would purchase the part from ANI, then turn around and resell it to the actual customer at a higher price. ANI would report

---

[5] These five companies were Daytona Aerospace, Riverside Enterprises, Aircraft Logic Systems, B.C. Inventories, and Thunderbird Aviation, all co-defendants in this case. See Doc. 99, at 14.

[6] Zaki contends that at various times, ANI, Daytona Aerospace, Riverside Enterprises, Aircraft Logic Systems, B.C. Inventories, and Thunderbird Aviation all listed 508 S. Military Trail, Deerfield Beach, Florida as their official address. See Doc. 99, at 3–4. Zaki also contends that ANI, Daytona Aerospace, Aircraft Logic Systems, and B.C. Inventories were all run, at various times, by some combination of Henry H. McFliker, Ayodh Persaud, and Shammie Persaud (the individual defendants in this case), and that Riverside Enterprises was run by Mr. McFliker's daughter and son-in-law. See id. at 4–5.

sales made through these affiliated companies to Zaki at the lower price paid by the affiliated company to ANI, rather than at the price paid by the end customer to the affiliated company. Zaki also came to believe that ANI was selling some of its parts without reporting the sales at all.

Zaki raised these concerns with ANI, and ANI responded by complaining that many of the parts it received were non-conforming and that the money it had advanced for shipping had been used to pay for the shipment of unsellable parts. Zaki then diverted its second shipment of aircraft parts (about eight containers worth) to another consignor in California, prompting ANI to file a lawsuit against the alternate consignor in June 2004. ANI also initiated a simultaneous arbitration proceeding against Zaki in Florida. By November 2004, Zaki and ANI had worked out a Settlement and Release Agreement (the "SRA"), dismissing the litigation and the arbitration and releasing each other from all prior claims. Doc. 99-1, at 26–27. Zaki also agreed to allow ANI to take possession of the second lot of parts that had been diverted to California and to ship a third lot of parts from Saudi Arabia.

The SRA reaffirmed the terms of the CSA with a few changes, which included the following. First, to settle the issue of non-conforming parts, the parties agreed that they would work together to identify any such parts and return them to Zaki. Id. at 22, § 5(a). Second, they agreed to waive all claims related to parts that were "listed on the inventory but not found in the warehouse." Id.,

7

§ 5(b).  Third, Zaki agreed to pay ANI $1.275 million as a settlement and to allow ANI to keep an additional 25 percent of all sales (raising its total commission to 75 percent) until the settlement amount was paid.  Id. at 21, § 4(b).  Fourth, to address Zaki's concerns that ANI was underreporting the actual prices for which its parts were being sold, ANI agreed to calculate Zaki's share based on the price paid by the final customer, not the intermediate price paid by one of ANI's "Affiliated Entities" (i.e., the other five companies also selling Zaki's parts).  Id. at 22, § 4(b)(4).  Fifth, Zaki agreed to pay half of ANI's "Warehouse Expenses," which were defined as those non-labor costs associated with storing Zaki's parts incurred between December 1, 2004, and November 30, 2006.  Id. at 23–24, § 6.  This would be done by allowing ANI to set off half of these expenses from Zaki's share of the sales proceeds (which had been reduced to 25 percent until the settlement amount was paid).  Id. at 22, § 4(b)(3).

Finally, the SRA reiterated ANI's reporting obligations, including ANI's duty to provide, on written request, copies of all purchase orders verifying the sale price for all sales by it or any of its affiliated companies, id., § 4(d), and, on reasonable notice, any invoices, policies, or related documents underlying any storage expenses deducted from Zaki's share of the sales, id. at 24, § 6(c).  ANI also promised to account separately for each of the three lots Zaki had consigned to it.  Id. at 25, § 8(e).

8

Unfortunately, this fragile détente proved fleeting.  Zaki claims that ANI did not completely cease its practice of calculating Zaki's share of the sale amount based on the transfer price paid by the affiliated entity (rather than the price paid by the final customer.)  Also, Zaki claims that ANI continued to conceal some sales altogether.  Finally, Zaki claims that ANI was manipulating its storage costs to improperly increase the amount it was entitled to set off, and that it continued to take offsets for these expenses beyond the two-year period specified in the SRA.

The combined effect of these actions, Zaki claims, was that Zaki received practically no money from ANI in the years following the execution of the settlement agreement.[7]  ANI does not contest Zaki's assertion that little money actually changed hands but contends that Zaki's sales revenue was insufficient to cover its share of the storage costs, and that ANI was entitled to add these costs to the $1.275 million settlement figure. In essence, ANI's perspective is that the total amount Zaki owed ANI was growing, rather than shrinking.

---

[7] According to an affidavit filed by Zaki's representative, Zaki received six payments totaling $57,689.21 in 2005; one payment of $12,844.90 in 2006; and two payments totaling $16,474.00 in 2007, for a total of $87,008.11.  Doc. 52-1, at 4.  By way of comparison, the sales reports that ANI sent to Zaki indicated that Zaki's overall share of the sales revenue for that same period was $1.94 million.  Doc. 399-1, at 2.

Despite repeated requests by Zaki, ANI provided virtually no documentation to support this claim.[8] Nor did ANI ever provide any account of how much of the $1.275 million settlement amount had been paid, or how Zaki's share of the proceeds were being applied to the debt.[9] In fact, other than the summary sales reports, which ANI provided intermittently and only until the end of the initial consignment period in 2008, it does not appear that ANI allowed Zaki to see any of its sales, expense, or inventory records.

---

[8] Ayodh Persaud, ANI's Chief Financial Officer, admitted on deposition that ANI had provided five or six months of expense reports in 2005, but none beyond that. Doc. 459-1, at 10.

[9] In fact, it does not appear that ANI kept any contemporaneous record of the balance of the settlement amount at all. The following colloquy occurred at Mr. Persaud's deposition:

> Q: Do you have a ledger of the debt remaining?
>
> A: I am preparing that right now.
>
> Q: Well, you haven't maintained a ledger up until this point in time, correct?
>
> A. That's correct.
>
> Q: Okay. Well, then how did you know, for example, say last month before you began the preparation of the ledger, how much money Mr. Zaki owed of the $1.275 million?
>
> A: I don't. I just told you. I'm just having that analyzed right now. I am working on preparing that right now.

Id. at 9. At trial, Mr. Persaud testified that he still wasn't sure whether any of the $1.275 million remained unpaid. Doc. 578, at 55.

10

Due to these and numerous other issues, Zaki decided not to renew the CSA. In June 2006, Zaki notified ANI of its intent to terminate the CSA effective June 2008, when the initial five-year consignment term expired. When that time came, Zaki again notified ANI that it had exercised its right to terminate the CSA and demanded that ANI cease selling its parts and return the remainder of Zaki's inventory. ANI refused, claiming, essentially, that § 8(c) of the CSA gave it a lien on Zaki's parts, such that it could continue selling the parts until Zaki's debt, consisting of the remainder of the settlement amount and the accruing storage expenses, had been paid.

## C.

To summarize, Zaki had three primary claims: (1) ANI was concealing sales; (2) ANI was reporting artificially low sales prices by selling parts through its affiliated companies; and (3) ANI was improperly calculating its storage expense setoffs. To determine the extent of any damages stemming from these alleged acts, Zaki would need three corresponding categories of information.

First, Zaki would need to know the number and value of the parts that remained in ANI's warehouse. By comparing the number of parts remaining in ANI's warehouse with the number of parts initially delivered to ANI, Zaki could calculate how many parts had been sold, damaged, or otherwise disposed of by

11

ANI. Then, by comparing this data with the sales reports ANI had provided to Zaki, Zaki would be able to determine whether ANI had concealed any sales.

Second, Zaki would need to know the final prices for which its parts were sold to outside purchasers. This information was presumably contained in the sales records of ANI and its affiliated entities. By examining these records, Zaki could determine whether ANI had reported any sales to it at a lower price than what the final purchaser paid.

Finally, Zaki would need to know the nature, amount, and timing of the storage expenses ANI had charged to Zaki. This information could be had from ANI's expense records. By reviewing the records, Zaki would be able to evaluate the validity of ANI's claimed offsets.

Each of these three categories of information was in ANI's exclusive possession. Because ANI refused to honor its contractual obligations to account for the consigned goods, see CSA § 4(g); SRA § 8(e), or to provide documentation supporting its claimed sales and expenses, see CSA § 4(e), 4(g); SRA §§ 4(d), 6(c), Zaki turned to the courts to compel ANI to produce this information.

12

D.

In March 2008, Zaki filed suit in the United States District Court for the Southern District of Florida against ANI, its five affiliated entities,[10] and their principals.[11]   In its third amended complaint, Zaki pled claims for breach of contract, unjust enrichment, civil theft, and conversion, as well as claims under Florida's Uniform Fraudulent Transfers Act ("FUFTA").  Zaki sought relief in the form of a declaratory judgment that it was entitled to immediate possession of its parts, compensatory and punitive damages, the imposition of a constructive trust, an injunction against further unauthorized sales, and, relevantly, an accounting.

Perhaps the most straight-forward way of determining how many parts remained was for Zaki to regain possession of its parts and simply count them. Accordingly, shortly after filing its third amended complaint, Zaki moved for summary judgment on its claim that it was entitled to immediate possession of the parts.  The District Court found that § 8(c) of the CSA appeared to grant ANI the exclusive option to decide whether or not to return Zaki's parts after the conclusion of the initial consignment term.  The District Court acknowledged, however, that

---

[10] Also included in the suit were three other corporate entities run by Mr. McFliker, Mr. Persaud, and Mrs. Persaud: Joseva Enterprises, Inc., Aerospace Parts Network, Inc., and DAI, LLC.

[11] Federal jurisdiction was based on diversity, per 28 U.S.C. § 1332. Zaki is Saudi Arabian corporation; all of the defendants are Florida residents.

13

such a reading would arguably create a contract of indefinite duration, which, depending on the circumstances, might make it terminable at will.[12]  Because resolution of this issue would necessitate a factual inquiry to discover the intended duration of the contract, the District Court denied Zaki's motion for summary judgment.

Precluded from counting its parts on its own turf, Zaki proceeded to discovery, for which it adopted a two-part strategy to obtain the information it needed.  First, it sought access to ANI's accounting records.[13]  By analyzing the records of ANI's sales and expenses, along with the underlying invoices, purchase orders, and statements, Zaki hoped to spot any undervalued sales or improperly apportioned expenses.  Second, Zaki continued to try to obtain an inventory of its parts, requesting permission from ANI to conduct the inventory on ANI's property, while ANI continued to sell the parts.

---

[12] See, e.g., Homestead v. Beard, 600 So. 2d 450, 453 (Fla. 1992) ("When a contract does not contain an express statement as to duration, the court should determine the intent of the parties by examining the surrounding circumstances and by reasonably construing the agreement as a whole. . . .  If a period of duration can be inferred from the nature of a contract and the circumstances surrounding its execution, the contract is not terminable at will and a court should give effect to the manifest intent of the parties.").

[13] Zaki defined "accounting records" as comprising ANI's "sales journals, purchase order journals, cash receipts journals, general ledgers[,] and inventory records." See Doc. 144, at 6.

14

ANI's response to these inquiries was less than enthusiastic. Zaki initially requested ANI's accounting records in January of 2009; the ensuing dispute spanned fourteen months and produced four separate court orders directing ANI to comply.[14] The records that ANI did finally produce were incomplete. First, although ANI did apparently provide some documentation in support of the sales amounts it had reported to Zaki,[15] see Doc. 144, at 10, it never allowed Zaki to review the underlying documentation for all the sales it had not reported to Zaki. Second, ANI did not identify the expenses for which it claimed offsets, or provide any of the underlying documents with which Zaki could evaluate the propriety of those expenses. The latter omission required another twelve months of wrangling

_____

[14] The Magistrate Judge granted Zaki's first motion to compel production of ANI's accounting records on August 4, 2009. Doc. 166, at 2–3. On October 5, 2009, the Magistrate Judge denied ANI's motion for clarification and again ordered the production of the records. Doc. 211, at 1 (docketed on October 6, 2009). On October 30, 2009, the Magistrate Judge granted a concurrent request by Zaki to broaden the scope of its order to all defendants, and ordered ANI and its co-defendants to produce their accounting records within ten days. Doc. 238, at 5–6. These materials were subsequently seized pursuant to an unrelated federal search warrant. Doc. 257, at 2. In January 2010, the Magistrate Judge again ordered ANI to produce any responsive documents as soon as it was able to do so. Doc. 272, at 1. ANI finally produced its electronic accounting records, albeit without the underlying documentation, in March 2010, after Zaki filed yet another motion to compel. See Doc. 328, at 3.

[15] Zaki alleges that for many of the sales, ANI provided the invoice and purchase order relating to the intermediate sale to an affiliated entity but failed to provide any documents reflecting the price paid by the outside purchaser. See Doc. 399, at 7.

15

before ANI finally agreed to identify the relevant expenses—so close to trial that Zaki was unable to use the information.[16]

Nor was Zaki ever able to find out how many of its parts remained unsold in ANI's warehouse. Zaki proposed to hire a team of twenty people to count the parts in a parking lot outside ANI's warehouse to minimize any interference with ANI's ongoing sales activity, while still completing the inventory of the millions of remaining parts in a reasonable period of time. ANI agreed to this plan in September 2009. Zaki soon discovered that the City of Margate, in which the warehouse was located, would not issue the necessary permit for the operation until ANI had cleared up two preexisting code violations and closed four outstanding permits. But despite multiple court orders to compel ANI to fix the violations and close the permits so the inventory could go forward, ANI never did

---

[16] After failing to receive this information when ANI produced its electronic accounting records in March 2010, Zaki first sent another discovery request, specifically asking ANI to quantify the expenses for which it had claimed offsetting deductions, and to provide any documents supporting these offsets. When that failed, Zaki moved to compel on August 2, 2010. Doc. 328. This request was ultimately granted on February 25, 2011, Doc. 405, at 3–4, less than a month and a half before the trial was scheduled to start, see Doc. 269, at 3.

ANI eventually identified the expenses for which it claimed it was entitled to offsetting deductions, but only after the deadline for making the pre-trial expert disclosures required by Rule 26(a)(2) had passed on March 3, 2011. See Fed. R. Civ. P. 26(a)(2). As a result, Zaki was unable to provide the necessary summary of its expert's expected opinion as to the validity of ANI's claimed offsets by the deadline, and the court ultimately precluded Zaki's expert from offering any testimony as to the propriety of these offsets at trial. See Doc. 475, at 10; Doc. 488.

16

so.[17] Zaki ultimately went to trial with no idea how many of its parts remained in

ANI's warehouse.

E.

After two years of discovery, neither aspect of Zaki's plan to uncover the

information necessary to establish its damages had yielded fruit.  Zaki had not been

able to obtain a complete picture of ANI's accounting practices, nor had it been

able to count its parts.  Zaki knew little more about the extent of its damages than

before it had filed suit.

It was at this point that ANI moved for summary judgment on all counts.

Addressing Zaki's request for an accounting, ANI argued that since Zaki had been

able to obtain all of the reports ANI had prepared summarizing Zaki's sales

through discovery, Zaki did not need an accounting.  Essentially, ANI's position

was that it had reported every sale of a part belonging to Zaki, had done so

---

[17] Zaki first moved to compel ANI to remedy its existing code violations in October 2009.  Doc. 224.  In January 2010, the District Court adopted a schedule proposed by the parties, under which ANI was to clear the violations by February 2010 and Zaki was to complete the inventory by August 2010.  Doc. 269, at 2.  When ANI had not yet cleared the violations by April 2010, Zaki filed another motion to compel, Doc. 287, which the Magistrate Judge granted on June 23, 2010, Doc. 312.  By this time, the municipal fire marshal had cited ANI for additional violations and shut down the warehouse altogether.  Id. at 2–3.  The violations remained unresolved when the August 2010 deadline ran, which prompted Zaki to move for an extension of the deadline.  Doc. 336, at 2–3.  The District Court summarily denied this motion on February 24, 2011. Doc. 404.

17

accurately, and all of its offsets were warranted and correctly calculated. Zaki's argument in opposition was that it should not be required to accept ANI's reporting at face value, especially since the accuracy of that reporting was the heart of their dispute. Zaki also pointed out that not only had ANI shirked its contractual obligations to account, but ANI had also failed to provide vital information to Zaki during discovery—information that could easily be obtained in a court-directed accounting.

The District Court granted ANI's motion and struck Zaki's request for an accounting. The court found that Zaki failed to meet the requirements under Florida law for an accounting because it had an adequate remedy at law in the form of its breach-of-contract action. The court noted that a court-directed accounting is inappropriate where the plaintiff has had an opportunity to establish its damages through discovery and concluded that "[n]othing in the record indicat[ed] why [Zaki] could not obtain the [information] it need[ed] through discovery." Zaki Kulaibee Establishment v. McFliker, 788 F. Supp. 2d 1363, 1371 (S.D. Fla. 2011).

The consequence of the District Court's ruling was that all of Zaki's claims would be tried to a jury. The trial began on July 11, 2011, and lasted seventeen days. At the close of the Zaki's case on July 21, the District Court granted defendants' motions for judgment as a matter of law on Zaki's claims for unjust enrichment and conversion and granted in part defendants' motions for judgment

18

as a matter of law on Zaki's claims for civil theft and FUFTA violations.  The jury

thereafter found for the defendants on the remaining claims for civil theft and

FUFTA violations.  On Zaki's breach-of-contact claims against ANI, the jury

found for Zaki and fixed its damages at $312,500.[18]  The court then entered final

judgment for Zaki on its breach-of-contract claim and for ANI and its co-

defendants on Zaki's other claims.[19]  Zaki now appeals that judgment.  It asks this

court to vacate the damages aspect of the judgment on the breach-of-contract claim

---

[18]  The jury found for Zaki in its answers to special interrogatories.  It answered "YES" to the following question:

> Do you find by a preponderance of the evidence that [ANI] breached the [CSA] and the [SRA] by (a) failing to . . . pay to [Zaki] all amounts to which it is entitled under the CSA and the [SRA], (b) failing to account for any insurance proceeds received relating to [Zaki's] goods, and failing to turn over [Zaki's] share of insurance proceeds, (c) allowing Daytona and other related Defendant-entities to possess, sell and engage in sham transactions involving [Zaki's] goods, or (d) failing to return [Zaki's] property upon expiration of the CSA and continuing to control and to sell [Zaki's] property beyond the expiration of the CSA, June 17, 2008.

Doc. 560, at 2.  From this answer, it is clear that the jury was persuaded that ANI had breached the contract under at least one of the four grounds.  From the amount that the jury awarded Zaki, we can deduce that jury credited Zaki's argument under (b)—that ANI breached the CSA by failing to turn over Zaki's share of the insurance proceeds.  Under the CSA, ANI was responsible for obtaining insurance on the parts, and if any proceeds were paid out under the policy, ANI was entitled to the first $1 million.  Any recovery above $1 million was to be split equally between ANI and Zaki.  See Doc. 99-1, at 5; § 4(h).  During the CSA term, ANI received insurance proceeds in the sum of $1,625,000 and admittedly failed to pay any of that amount to Zaki.  Zaki's contractual share of those proceeds was $312,500—precisely the amount of the jury award.

[19]  The total amount of the judgment in Zaki's favor was $424,163.58: the $312,500 awarded by the jury plus prejudgment interest in the sum of $111,663.58.

19

and to remand the case with the instruction that the District Court grant Zaki an accounting to determine the amount, if any, due from ANI.[20]

## II.

The accounting remedy[21] is grounded in equity; thus we review the District Court's decision to deny the remedy for abuse of discretion. Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1220 (11th Cir. 2002). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." United States v. Ellisor, 522 F.3d 1255, 1273 n.25 (11th Cir. 2008).

## A.

In a diversity case, where state law affords the underlying substantive right, federal courts are generally constrained to look to and follow the remedial treatment afforded by state courts. See McLeod v. Stevens, 617 F.2d 1038, 1041

---

[20] Zaki alternatively seeks a new trial on its breach-of-contract claim and civil theft claims on the ground that the District Court's jury instructions on those claims were erroneous in several respects. Since we vacate the court's judgment and remand the case for an accounting, we need not consider the instructions issues. We likewise do not consider whether the court erred in granting ANI judgment as a matter of law on Zaki's conversion claims.

[21] Zaki purports to appeal the dismissal of its accounting "claim." E.g., Appellant's Br. 27. We note that an accounting is best understood as a remedy for a cause of action, not as a cause of action in its own right. See Becker v. Davis, 491 F.3d 1292, 1305 (11th Cir. 2007), abrogated on other grounds by Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009) ("[A]n accounting is a remedy attached to a separate independent cause of action.").

(4th Cir. 1980) ("The proper remedy for the harm [the plaintiff] suffered is a question of substance that is governed by state law."); 19 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4513 (2d ed. 1996).  The parties agree that Florida law governs their dispute.  As a result, to determine whether Zaki is entitled to an accounting, we must look to the circumstances under which Florida courts grant an accounting.

Traditionally, Florida courts have granted an accounting in three circumstances: in cases of especially complicated or mutual accounts, where a fiduciary relationship existed between the parties, and in cases where discovery was required.  Nayee v. Nayee, 705 So. 2d 961, 963 (Fla. 5th Dist. Ct. App. 1998).  Given the availability of the modern discovery regime, the need for discovery, standing alone, is no longer generally regarded as a sufficient ground for granting an accounting.  See 1 Dan B. Dobbs, Law of Remedies § 4.3(5), at 610 (2d ed. 1993).

Complexity of accounts and fiduciary relations remain viable grounds for an accounting, however.  In the former situation, Florida law provides an accounting where the accounts between the parties are sufficiently complicated and an adequate remedy at law is lacking.  See Dahlawi v. Ramlawi, 644 So. 2d 523, 524 (Fla. 3d Dist. Ct. App. 1994) (per curiam) ("[E]quity will [provide an accounting] where the contract demands between litigants involve extensive or complicated

21

accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity." (quoting F. A. Chastain Constr., Inc. v. Pratt, 146 So. 2d 910, 913 (Fla. 3d Dist. Ct. App. 1962))).  In the latter situation, an accounting is appropriate in every case.  See Armour & Co. v. Lambdin, 16 So. 2d 805, 810 (Fla. 1944) ("[I]t may be said generally that whenever there is a fiduciary relationship such as that of trustee, agent, executor, etc., the right to an accounting in equity is undoubted."  (quotation marks omitted)).

To obtain an accounting under Florida law, then, a party must show either (1) a sufficiently complicated transaction and an inadequate remedy at law or (2) the existence of a fiduciary relationship.[22]

---

[22] We note that imprecise language in this court's prior decisions has muddied the waters as to the necessary showing for an accounting under Florida law.  See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1071 (11th Cir. 2007) ("Under Florida law, a party that seeks an equitable accounting must show that: 1) the parties share a fiduciary relationship or that the questioned transactions are complex, and 2) a remedy at law is inadequate." (emphasis added) (citing Kee v. Nat'l Reserve Life Ins. Co., 918 F.2d 1538, 1540 (11th Cir. 1990))).

Whatever the state of Florida law at the time of Kee, we believe our statement above accurately reflects current Florida law, as demonstrated by several post-Kee decisions.  See Cassedy v. Alland Invs. Corp., 982 So. 2d 719, 720 (Fla. 1st Dist. Ct. App. 2008) ("As fiduciaries, Appellees were required to render a final accounting."); Ashemimry v. Ba Nafa, 778 So. 2d 495, 498 (Fla. 5th Dist. Ct. App. 2001) ("Where a fiduciary or trust relationship exists, an action for an accounting is considered equitable in nature without regard to other considerations." (citing Nayee v. Nayee, 705 So. 2d 961, 963 (Fla. 5th Dist. Ct. App. 1998))).

22

B.

Zaki contends that by agreeing to hold and sell Zaki's parts as a consignee, ANI assumed the mantle of a fiduciary. The precise nature of the fiduciary relationship is among "the most elusive concepts in Anglo-American law." Deborah A. DeMott, Beyond Metaphor: An Analysis of Fiduciary Obligation, 1988 Duke L.J. 879, 879. Generally speaking, however, a fiduciary relationship is one in which "one person is under a duty to act for the benefit of another on matters within the scope of the relationship." Black's Law Dictionary 1402 (9th ed. 2009). Florida courts have defined fiduciary obligations quite broadly:

> [A] fiduciary duty extends 'to every possible case . . . in which there is confidence reposed on one side and the resulting superiority and influence on the other. . . . The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.'

Masztal v. City of Miami, 971 So. 2d 803, 808–09 (Fla. 3d Dist. Ct. App. 2007) (quoting Quinn v. Phipps, 113 So. 419, 421 (Fla. 1927)). The characteristics of a consignment relationship place it well within this broad category.

A consignment relationship is one in which one party, the consignor or principal, transfers certain goods to another party, the consignee or factor, who undertakes to sell the goods on the consignor's behalf in exchange for a commission on the sale. E.g., Gadsden Cnty. Tobacco Co. v. Corry, 137 So. 255, 257 (Fla. 1931). The consignee is generally in the business of selling such goods,

23

and usually sells consigned goods under his own name.  Id.  The consignor retains title to the goods, however, and thus the consignee is best understood as a type of bailee.[23]  Cf. Neild v. District of Columbia, 110 F.2d 246, 259 (D.C. Cir. 1940). Consignment relationships promote market efficiency by allowing persons who have goods, but lack the expertise necessary to attain the best price for those goods, to benefit from the consignee's superior experience and connections in the particular market.  Brunswick Leasing Corp. v. Wis. Cent., Ltd., 136 F.3d 521, 529 (7th Cir. 1998).

The essential circumstances under which Florida law imposes fiduciary obligations—where one party delegates power to another to carry out a specific task on his behalf, and in so doing, reposes significant trust and confidence in the other—are inherent in a consignment relationship.  The relationship is designed to place both the consignor and the consignee in a better position than either could attain separately.  The consignor benefits by being able to sell his goods for a higher price than he would otherwise be able to secure, and the consignee benefits

---

[23] A consignee differs from a traditional bailee in that a consignee does not have an obligation to return the specific goods consigned, but rather to account for his disposition of the goods.  See 8 C.J.S. Bailments § 11 (2005) ("The rule that where a person receiving property is not bound to return the identical thing received, but may account therefor in money or other property, or thing of value, the transaction is a sale, is not applicable to bailments or consignments for sale . . . .  A consignment is a type of bailment where the goods are entrusted for sale . . . .").

24

by receiving a commission he would not otherwise have received and by bolstering his reputation as a superior vendor of the type of goods consigned.

But this mutually beneficial result can only be achieved with the exercise of significant trust by the consignor. A consignor must not only entrust possession and control over his goods to the consignee, but also trust the consignee to sell his goods for a fair price and remit the proceeds (less a commission) to him. Furthermore, because a consignee is not tasked with <u>holding</u> the property entrusted to him and returning the <u>same property</u> to the consignor at a later date, but rather with <u>disposing</u> of the property and returning <u>something else</u> (the fungible proceeds of the sales of the goods) to the consignor, the need to impose a fiduciary obligation to account becomes particularly apparent.

It is little wonder, then, that while not always expressly identified as such, courts from around the country have long imposed on consignees certain of the duties of fiduciaries. <u>See</u>, <u>e.g.</u>, <u>Ferguson v. Porter</u>, 3 Fla. 27, 30 (1850) (imposing duty on consignee to follow principal's instructions); <u>Cusick v. Phillippi</u>, 709 P.2d 1226, 1230 (Wash. Ct. App. 1985) (noting that "[t]he standard of care of a [factor] has not been expressed in fiduciary terms in Washington, but certain duties have been recognized" including the duty "to adhere faithfully to all instructions" and "the rule requiring open disclosure and full accounting . . . ."); <u>see also</u> <u>Union Stock-Yards Nat'l. Bank v. Gillespie</u>, 137 U.S. 411, 420–21, 11 S. Ct. 118, 121, 34

L. Ed. 724 (1890) ("It cannot be doubted that an element of a fiduciary nature enters into the obligation of the factor . . . . [T]here is a reliance of a principal on his agent, a confidence that the agent will do as his principal directs, and be loyal to the duties springing from such relation.").

Notable among these duties is the consignee's obligation to render a true and accurate account of his stewardship of the consignor's goods.  E.g., Wilson v. Burch Farms, Inc., 627 S.E.2d 249, 259 (N.C. Ct. App. 2006) ("After selling the goods, the consignee must account to the consignor with the proceeds from the sale."); Cusick, 709 P.2d at 1230; 24A Fla. Jur. 2d Factors and Commission Merchants § 20 (2011).

Furthermore, it has long been recognized that a court-directed accounting is warranted if a consignee disclaims his or her duty to account.  See generally Wilson v. Duncan, 112 So. 48 (Fla. 1926) (per curiam); see also State ex rel. Cockrum v. Southern, 83 S.W.2d 162, 164 (Mo. Ct. App. 1935) ("It is well settled that [a principal-factor] relationship is a fiduciary one and constitutes the factor a quasi trustee for the principal and a suit in equity against the factor for an accounting may be brought when the facts warrant a suit for an accounting."); Mackenzie v. Johnston, (1819) 56 Eng. Rep. 742; 35 C.J.S. Factors § 62 (2009).  In fact, as one distinguished scholar recognized, a disputed consignment relationship is a paradigmatic case for an accounting.  See Christopher C. Langdell, A Brief

26

Survey of Equity Jurisdiction (pt. 4), 2 Harv. L. Rev. 241, 260 (1889) ("The largest and most important class of persons, however, against whom [an equitable accounting] will lie, are agents who make it their business . . . to receive the property of others into their possession for the purpose of selling it . . . .  Agents of this class [include] factors or commission merchants . . . .").

ANI admits that it had a consignor-consignee relationship with Zaki.  See Doc. 106, at 1.  As a consignee, ANI had a fiduciary obligation to account for its handling of Zaki's parts.  The contract between the parties contained no provision altering or abridging this common-law duty; in fact, both the CSA and the SRA explicitly spell out ANI's duty to keep complete and accurate records, and Zaki's right to review those records.  See CSA §§ 4(e), 4(g); SRA §§ 4(d), 6(c), 8(e).

ANI concededly failed to comply with its accounting and reporting obligations.  ANI does not dispute that it failed to provide regular sales reports or the supporting documents for those sales reports.  ANI never conducted an inventory of Zaki's parts and thus was unable to furnish any inventory reports.  Nor did ANI provide any documentation verifying its claimed storage expense offsets or keep any account of how the $1.275 million settlement amount was being paid off.

Given ANI's manifest failure to account for its stewardship of Zaki's parts, Zaki was, and is, entitled to a court-directed accounting.  The District Court

27

acknowledged that ANI had breached its reporting and accounting obligations under the contract and even granted summary judgment for Zaki on this point. See Doc. 495, at 25. Nevertheless, the District Court ultimately directed a verdict for ANI, finding that Zaki had failed to show how ANI's omission had caused any damages. See Doc. 581, at 118. This sequence of events aptly illustrates why a court-directed accounting was the appropriate remedy here.[24]

## C.

The District Court reasoned that an accounting was unnecessary because Zaki could obtain adequate relief in an action at law for breach of contract. In light of the fiduciary relationship between the parties, applying this additional

---

[24] A court-directed accounting is the appropriate remedy for this type of breach because, unlike most other contractual obligations, a consignee's breach of its obligation to account cannot be effectively redressed by an action for damages. The raison d'être for the obligation is to provide consignors with the information necessary to discover how consignees have disposed of their goods, thus allowing consignors to determine the existence of any damages. Compliance with this obligation provides the consignor with an unquantifiable benefit in the form of information that allows him to determine whether to sue for damages. Failure to provide that information results in an unquantifiable harm to the consignor in the form of insufficient information to make that decision.

Because the harm is unquantifiable, it cannot, of itself, provide a basis for more than nominal damages. See Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1212 (11th Cir. 2006) ("[R]ecovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable degree of certainty." (quoting Miller v. Allstate Ins. Co., 573 So. 2d 24, 27–28 (Fla. 3d Dist. Ct. App. 1990)) (quotation marks omitted)). Thus, the only meaningful way to vindicate this right is via an accounting.

28

requirement was error.[25]  Nevertheless, without the foundational information that an accounting would have provided, Zaki was incapable of quantifying its damages, and was thereby precluded from obtaining any meaningful relief.  Thus, even by the District Court's standard, Zaki was entitled to an accounting.

In a perfect world, discovery may have provided the means to force ANI to disgorge all the information necessary for Zaki to quantify its damages, i.e., how many parts remained in ANI's possession; the condition of the remaining parts; how many of the parts had been sold; whether any parts had been discarded or otherwise disposed of; the prices at which the parts were sold; and the expenses for which ANI took offsets.  In reality, however, the discovery regime provided by the Federal Rules of Civil Procedure is maladapted to situations such as this—

---

[25] Of course, as a theoretical matter, it is accurate to say that equitable relief may only be granted in the absence of an adequate remedy at law.  See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478, 82 S. Ct. 894, 900, 8 L. Ed. 2d 44 (1962).  However, the very reason courts began ordering and overseeing accounting proceedings was to afford relief to principals who were injured by their fiduciaries, yet, due to the informational asymmetries and trust inherent in the relationship, were unable to obtain relief via traditional remedies at law.  See generally Joel Eichengrun, Remedying the Remedy of Accounting, 60 Ind. L.J. 463, 464–67 (1985) (tracing the history of the remedy).

In essence, then, a principal's right to an accounting vis-à-vis a fiduciary is the result of an ex ante determination that legal remedies are inadequate in these contexts, and that courts should exercise their equitable authority to grant an accounting to administer full justice between the parties.  Thus, the rule in Florida that "[w]here a fiduciary or trust relationship exists, an action for an accounting is considered equitable in nature without regard to other considerations."  Ashemimry, 778 So. 2d, at 498 (emphasis added).

29

situations in which one party is entrusted with valuable goods, has the exclusive responsibility to maintain information regarding the disposition of those goods, and has a substantial incentive to withhold this information from the other party.

The facts of this case provide compelling support for this point. Over the course of more than two years of discovery, ANI waged a largely successful campaign to avoid providing basic sales and expense information regarding its handling of Zaki's parts, sidestepping at least three separate court orders to produce the information in the process. ANI managed to avoid sanctions by providing enough information to give the appearance of compliance, but not enough to allow Zaki to actually determine the extent of its damages. Due perhaps to the scope of the discovery or a lack of technical accounting expertise, these omissions were not perceived and remedied in a timely fashion, and ultimately Zaki went to trial unable to verify ANI's sales or its claimed setoffs.

ANI also manipulated the discovery procedures to prevent Zaki from discovering how many of its parts remained. ANI retained possession and control of the remainder of Zaki's parts—and along with them, the only conclusive means of determining the existence and extent of any damages. Yet ANI repeatedly stymied Zaki's attempts to conduct an inventory of those parts while simultaneously spinning out the discovery process for as long as possible. As a result, Zaki was forced to involve the District Court in its efforts to obtain the

30

inventory information it needed from ANI.  In an attempt to get Zaki this information, the Magistrate Judge was reduced to ordering ANI to fix municipal fire code violations in the hopes that the city would issue a permit allowing Zaki to conduct the inventory, and to intervening in disputes about whether the parties had agreed to conduct the inventory indoors with ten people, or outdoors with twenty people.  The Magistrate Judge inevitably became bogged down trying to manage these effectively unenforceable orders.  Eventually, the court's inexorable march toward trial overtook Zaki's need for an inventory.

We do not recount these woes to disparage the Magistrate Judge or the District Court.  The unfortunate manner in which the pretrial litigation played out in this case simply punctuates our point: a court-directed accounting was the proper remedy here.  Zaki's breach of contract action did not constitute an adequate remedy because as a practical matter, even if Zaki constructed an otherwise perfect case for breach, ANI's machinations prevented Zaki from obtaining the requisite information to prove damages.  Discovery simply could not provide the kind of close, consistent, and knowledgeable oversight necessary to procure that information from a sophisticated party who both possessed all the relevant details and had substantial motivation to frustrate the discovery process.

31

D.

A court-directed accounting is ideally tailored to address problems of this nature. When a court grants an accounting, it typically refers the matter to a master to conduct a full inquiry into the accounts and transactions between the parties. See 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2605 (3d ed. 2008). Based on that inquiry, the master then makes or recommends findings of fact to the court. Fed. R. Civ. P. 53(a)(1).[26]

This arrangement largely circumvents the problems detailed above. Instead of relegating a consignor to a lopsided struggle against a consignee armed with all the advantages of time and information, a neutral master, invested with the coercive power of the court, is tasked with obtaining all of the relevant information, untangling the disputed items, and proposing a resolution that best affords justice to the parties. This is what Zaki sought, what Zaki was entitled to, and what Zaki should have received.

---

[26] Rule 53 details the basic procedures to follow when appointing a master to conduct an accounting. Obviously the issue of who pays for the accounting is an important consideration. According to Rule 53(g)(3), courts have discretion to allocate the master's costs based on "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(g)(3).

III.

In conclusion, we hold that the District Court abused its discretion when it refused to grant Zaki an accounting. The District Court failed to recognize that the fiduciary nature of the relationship between the parties alone constituted sufficient grounds for an accounting under Florida law and erroneously concluded that an action for damages afforded an adequate alternative. Accordingly, we REVERSE the judgment of the District Court and REMAND the case for an accounting.

SO ORDERED.